# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

CARA MCCLURE, ET AL.,

*Plaintiffs-Appellees*,

v.

JEFFERSON COUNTY COMMISSION,

*Defendant-Appellant*.

On Appeal from the United States District Court for the
Northern District of Alabama, No. 2:23-cv-00443 (Haikala, J.)

## AMENDED TIME-SENSITIVE MOTION FOR STAY PENDING APPEAL

Theodore A. Lawson, II
JEFFERSON COUNTY ATTORNEY'S OFFICE
716 Richard Arrington Jr. Blvd. North
Room 280
Birmingham, AL 35203
(205) 325-5688
lawsont@jccal.org

Michael Taunton
BALCH & BINGHAM LLP
1901 Sixth Ave. N., Suite 1500
Birmingham, AL 35203
(205) 226-3451
mtaunton@balch.com

September 25, 2025

Taylor A.R. Meehan
Rachael C.T. Wyrick
Marie E. Sayer
Soren Geiger
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, Virginia 22209
(703) 243-9423
taylor@consovoymccarthy.com
rachael@consovoymccarthy.com
mari@consovoymccarthy.com
soren@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
(703) 243-9423
patrick@consovoymccarthy.com

*Counsel for Appellant*

## CERTIFICATE OF INTERESTED PERSONS

Per Rule 26.1 and Eleventh Circuit Rule 26.1, the undersigned certifies that the following may have an interest in the outcome of this appeal:

1. Addoh-Kondi, Alexia, *Addoh-Kondi Plaintiff-Appellee*

2. Alabama State Conference of the NAACP, *McClure Plaintiff-Appellee*

3. Bernstein, C'Zar, *Former Counsel for Defendant-Appellant*

4. Blacksher, James, *Counsel for Addoh-Kondi Plaintiffs-Appellees*

5. Bonner, Cynthia, *Addoh-Kondi Plaintiff-Appellee*

6. Brown, Ja'Nelle, *Addoh-Kondi Plaintiff-Appellee*

7. Carter, Brittany, *Counsel for McClure Plaintiffs-Appellees*

8. Carroll, Donald, *Counsel for Defendant-Appellant*

9. Clemon, U.W., *Counsel for Addoh-Kondi Plaintiffs-Appellees*

10. Geiger, Soren, *Counsel for Defendant-Appellant*

11. Greater Birmingham Ministries, *McClure Plaintiff-Appellee*

12. Grisafi, Lily, *Counsel for McClure Plaintiffs-Appellees*

13. Haikala, Madeline, *United States District Judge (N.D. Ala.)*

14. Hall, Eric, *Addoh-Kondi Plaintiff-Appellee*

15. Hansen, Michael, *Addoh-Kondi Plaintiff-Appellee*

16. Hessel, Daniel, *Former Counsel for McClure Plaintiffs-Appellees*

17. Juarez, Julia, *Addoh-Kondi Plaintiff-Appellee*

18. Lane, Kathleen, *Former Counsel for Defendant-Appellant*

19. Lawsen, Nicki, *Counsel for McClure Plaintiffs-Appellees*

20. Lawson, II, Theodore, *Counsel for Defendant-Appellant*

21. Long, Charles, *Addoh-Kondi Plaintiff-Appellee*

22. McClure, Cara, *McClure Plaintiff-Appellee*

23. Meehan, Taylor, *Counsel for Defendant-Appellant*

24. Metro-Birmingham Branch of the NAACP, *McClure Plaintiff-Appellee*

25. Mordecai, Kacey-Ann, *Counsel for McClure Plaintiffs-Appellees*

26. Muhammad, William, *Addoh-Kondi Plaintiff-Appellee*

27. Randall, Fred, *Addoh-Kondi Plaintiff-Appellee*

28. Rice, Richard, *Counsel for Addoh-Kondi Plaintiffs-Appellees*

29. Ross, Deuel, *Counsel for McClure Plaintiffs-Appellees*

30. Rouco, Richard, *Counsel for Addoh-Kondi Plaintiffs-Appellees*

31. Sadasivan, Kathryn, *Counsel for McClure Plaintiffs-Appellees*

32. Sayer, Marie, *Counsel for Defendant-Appellant*

33. Sheikh, Uruj, *Counsel for McClure Plaintiffs-Appellees*

34. Smith, Tammie, *Addoh-Kondi Plaintiff-Appellee*

35. Strawbridge, Patrick, *Counsel for Defendant-Appellant*

36. Taunton, Michael, *Counsel for Defendant-Appellant*

37. Walker, Dorman, *Former Counsel for Defendant-Appellant*

38. Walker, Robert, *Addoh-Kondi Plaintiff-Appellee*

39. Wright, Brenda, *Counsel for McClure Plaintiffs-Appellees*

40. Wyrick, Rachael, *Counsel for Defendant-Appellant*

Dated: September 25, 2025                    /s/ Taylor A.R. Meehan

# TABLE OF CONTENTS

Table of Authorities .................................................................................................................ii

Introduction ..........................................................................................................................1

Background............................................................................................................................2

Legal Standard......................................................................................................................6

Argument ..............................................................................................................................6

    I.     The Commission Is Likely to Prevail on Appeal. ............................................6

          A.     Evidence of past §5 compliance is not evidence of present-day racial gerrymandering. ...............................................................7

          B.     The district court disregarded *Alexander*. .......................................... 11

               1.     Plaintiffs did not rule out core retention. .................................. 12

               2.     Plaintiffs did not rule out anchoring Districts 1 and 2 in Birmingham and other municipalities. ....................................... 16

               3.     Plaintiffs' illustrative plans ignore political considerations. .... 17

               4.     Other non-racial considerations went ignored. ........................ 18

    II.    The Equities Favor a Stay.................................................................... 20

          A.     A stay preserves the status quo of neutrally drawn districts.............. 20

          B.     *Purcell* warrants a stay. .................................................................. 22

Conclusion.......................................................................................................................... 23

Certificate of Compliance................................................................................................... 25

Certificate of Service .......................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez,*
  585 U.S. 579 (2018) ...............................................................6, 11, 20

*Alabama Legislative Black Caucus v. Alabama,*
  575 U.S. 254 (2015) ........................................................................ 15

*Alexander v. South Carolina NAACP,*
  602 U.S. 1 (2024) ........................... 1, 6, 7, 9, 10, 11, 12, 13, 14, 18, 19, 20

*Brnovich v. Democratic Nat'l Comm.,*
  594 U.S. 647 (2021) ..........................................................................6

*Chen v. City of Houston,*
  206 F.3d 502 (5th Cir. 2000) ............................................................9

*Christian Ministerial Alliance v. Jester,*
  2025 WL 1635282 (E.D. Ark. June 9, 2025) ................................. 14

*Clark v. Putnam County,*
  293 F.3d 1261 (11th Cir. 2002)........................................................8

*Cooper v. Harris,*
  581 U.S. 285 (2017) ..........................................................................8

*Easley v. Cromartie,*
  532 U.S. 234 (2001) .................................................................7, 10, 17

*Grace, Inc. v. City of Miami,*
  2023 WL 5286232 (11th Cir. Aug. 4, 2023).................................. 21

*Johnson v. Governor of State of Fla.,*
  405 F.3d 1214 (11th Cir. 2005)...................................................... 11

*League of Women Voters of Fla. v. Fla. Sec'y of State,*
  32 F.4th 1363 (11th Cir. 2022) ...........................................6, 20, 22

*LWV of Fla. v. Fla. Sec'y of State,*
  66 F.4th 905 (11th Cir. 2023) ........................................................ 11

*Merrill v. Milligan,*
  142 S. Ct. 879 (2022) ...................................................................... 21

*Miller v. Johnson,*
  515 U.S. 900 (1995) ...............................................................8, 10, 21

*Nken v. Holder,*
  556 U.S. 418 (2009) ..........................................................................6

*Petteway v. Galveston Cnty.*,
   87 F.4th 721 (5th Cir. 2023) ........................................................................... 22

*S.C. NAACP v. Alexander*,
   649 F. Supp. 3d 177 (D.S.C. 2023) ............................................................... 12

*Shaw v. Hunt*,
   517 U.S. 899 (1996) ................................................................................... 1, 21

*Shelby County v. Holder*,
   570 U.S. 529 (2013) ........................................................................................ 8

*Swain v. Junior*,
   958 F.3d 1081 (11th Cir. 2020) ..................................................................... 20

*Thompson v. Dewine*,
   959 F.3d 804 (6th Cir. 2020) ......................................................................... 22

**Statutes**

52 U.S.C. §10304 ..................................................................................................... 2

Ala. Code §11-3-1.1(c) ........................................................................................... 23

## INTRODUCTION

Last year, the Supreme Court reaffirmed plaintiffs' "especially stringent" burden in racial gerrymandering cases. *Alexander v. South Carolina NAACP*, 602 U.S. 1, 11 (2024). Plaintiffs must "rule out the *possibility*" of non-racial explanations for district lines. *Id.* at 24 (emphasis added). Only then can a court conclude lawmakers intentionally sorted citizens by race. *Shaw v. Hunt*, 517 U.S. 899, 907 (1996). But in this racial gerrymandering case, the district court relegated its application of *Alexander* to a footnote. Op.127 n.44. Undisputed non-racial explanations went ignored.

Irreconcilable with *Alexander*, the district court adopted this rule: *past* compliance with §5 of the Voting Rights Act is enough to render *present-day* districts unconstitutional. Applied here, Jefferson County Commission districts are unconstitutional *not* because there was evidence that race predominated when the commission redistricted in 2021. There was not even a passing reference to race or the VRA before a bi-racial majority approved the districts, 4-1, this redistricting cycle. Rather, the 2021 districts are unconstitutional, the court held, because of decades-old letters to the Department of Justice—letters simply stating that past redistricting plans did not abridge or diminish voting rights with supporting demographic data. That was "[r]emedial racial gerrymandering," in the court's words. Op.88. And it was enough to enjoin the use of the 2021 districts. By that logic, present-day districts in any jurisdiction once subject to §5 are tainted, whether or not race actually predominated this decade or decades ago.

This Court is likely to reverse, but delays in the court below leave no time to do so before the 2026 primary elections and preceding deadlines. The Commission therefore asks this Court to stay the injunction pending appeal **by October 14, 2025**, which is one week, excluding the federal holiday, before districts must be settled for the 2026 election season on October 20, 2025. Stephenson Dec. ¶21 (Att.2, DE194-1).[1]

## BACKGROUND

A. In 1985, Jefferson County entered into a consent decree in response to Voting Rights Act litigation. At-large commission districts were changed to five single-member districts. DE169-1 at 2.[2] The decree imposed *no* "explicit racial targets." Op.14. The county then obtained DOJ's required §5 "preclearance" for the redistricting change. DE169-2 at 2; DE169-3. Section 5 correspondence described the "anticipated *effect* of the change" as creating five single-member districts, including two majority-minority districts (Districts 1 and 2). DE169-2 at 3 (emphasis added); *see* 52 U.S.C. §10304.

The Commission redistricted in 1993, 2001, and 2013, each time retaining the same basic geography by anchoring Districts 1 and 2 in Birmingham. DE173 311:17-19. Each time DOJ precleared the changes, DE169-3 at 135; DE 169-4 at 217; DE169-111 at 2, and §5 letters nowhere contained racial targets or otherwise conveyed any

---

[1] Defendant proposes Plaintiffs' response brief due by September 29 at 5 p.m., and Defendant's reply by October 1 at 12 p.m.

[2] DE refers to "docket entry" in *McClure v. Jefferson County Commission*, No. 2:23-cv-443. Page numbers reflect blue ECF pagination. 11th Cir. R. 28-5.

intent to redistrict by race, DE169-3 at 3; DE169-4 at 5; DE169-5 at 1081. No past plan was ever challenged as racially gerrymandered.

**B.** Redistricting began anew after the 2020 census. Shown below, the county's population had shifted away from central Jefferson County (where Districts 1 and 2 are located) and into the surrounding areas (where Districts 3, 4, and 5 are located), leaving Districts 1 and 2 underpopulated. DE170-3 at 5-6. Also shown below, the census showed that Black voting-age population (BVAP) increased in Districts 1, 3, 4, and 5 while decreasing in District 2.

| | **2010 BVAP (2013 Plan)** | **2020 BVAP (pre-redistricting)** | **+/- 2021 Ideal Pop. (pre-redistricting)** | **2021 BVAP (Enacted Plan)** |
|---|---|---|---|---|
| **District 1** | 73.2% | 76.4% | -9.1% (-12,269) | 76.3% |
| **District 2** | 71.3% | 66.7% | -10.1% (-13,572) | 64.1% |
| **District 3** | 21.7% | 28.6% | +5.8% (+7,855) | 25.8% |
| **District 4** | 22.4% | 29.5% | +5.3% (+7,108) | 25.7% |
| **District 5** | 11.0% | 14.1% | +8.0% (+10,879) | 14.0% |

DE169-75; DE170-16 at 10, 22, 31, 34.

At a November 2021 public hearing, the Commissioners—all running for re-election—expressed their desire to keep their existing constituents. DE170-8 35:24-36:3, 38:6-12, 39:16-18, 45:8-10. No public commenters criticized proposed plans as racially gerrymandered. *Id.* 19:19-29:6; DE174 668:16-669:16. The Commission adopted the Enacted Plan by a 4-1 vote, with only District 1's commissioner opposing. DE169-16.

The Enacted Plan made few changes to the 2013 districts. Shown below, the Enacted Plan moved only a handful of precincts to re-populate Districts 1 and 2 while keeping 95.1% of residents in their existing districts. DE170-2.



*Jefferson County Commission Districts 1-5*

DE170-2.

Given these minimal changes, neither the resulting racial demographics nor the politics of the Enacted Plan materially differed from the existing districts just before redistricting. *See* Table *supra* at 3. When Commissioners successfully ran again in 2022, the Commission retained its political makeup of 3 Republicans and 2 Democrats. DE174 670:9-17, 689:21-22.

**C.** Seventeen months after the Enacted Plan's adoption, two groups of Plaintiffs challenged the districts as racially gerrymandered. After the Supreme Court decided *Alexander*, the Commission moved for summary judgment. DE94. Plaintiffs filed cross-motions for summary judgment. DE96; DE101 (2:23-cv-503). The court denied summary judgment and held a four-day bench trial in January 2025. DE164.

Eight months later, on September 16, 2025, the district court permanently enjoined the use of all five districts. DE191. The court relegated its application of *Alexander* to a single footnote nearing the end of its 139-page opinion. There was no explanation for how Plaintiffs overcame the presumption of legislative good faith. *Contra Alexander*, 602 U.S. at 10-11. Nor how Plaintiffs ruled out non-racial explanations for districts. The district court excused Plaintiffs from that requirement to "untangle race from other permissible considerations," including "core preservation," *Id.* at 7, because of Jefferson County's "history" of complying with §5 of the VRA. Op.127 n.44; *see id.* at 88-89, 104-05.

The district court ordered the parties to "file a joint report on the development of a remedial redistricting plan" by October 16. Op.139. On September 24, the district court denied Defendant's motion for a stay and indicated an opinion would follow. DE204. During a hearing the same day, the court also indicated that Plaintiffs' counsel propose a schedule for remedial proceedings to begin immediately and conclude in less than four weeks.

## LEGAL STANDARD

Stays pending appeal turn on likely success on the merits, irreparable harm to the movant, substantial injury to interested parties, and the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). This Court also allows stays pending appeal "'when a lower court has issued an injunction of [an] election law in the period close to an election.'" *League of Women Voters of Fla. v. Fla. Sec'y of State*, 32 F.4th 1363, 1371 (11th Cir. 2022).

## ARGUMENT

This Court should stay the district court's injunction. Plaintiffs' racial gerrymandering claim is meritless. Without a stay, what were race-neutral districts will be replaced with race-based districts for the 2026 election season. Plaintiffs' year-plus delay in bringing their lawsuits and the eight-month gap between trial and permanent injunction leave insufficient time to redraw districts and no time to appeal before election deadlines commence.

## I.    The Commission Is Likely to Prevail on Appeal.

The Constitution forbids racial gerrymandering, where race alone explains districts. *Alexander*, 602 U.S. at 7, 11, 20. Proving racial gerrymandering requires proof of race-predominant intent. *Id.*; *Abbott v. Perez*, 585 U.S. 579, 585-86 (2018) ("intentionally assigning … on the basis of race); *see also Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689 (2021) (legislative body "as a whole was imbued with racial motives"). Before-and-after comparisons of districts' racial demographics are not enough. *See Alexander*, 602 U.S. at 20. After all, those racial demographics can be a "side effect" of permissible,

non-racial redistricting considerations. *Id.* And lawmakers have no "affirmative obligation" to then alter those demographics in pursuit of some racial goal, *Easley v. Cromartie*, 532 U.S. 234, 249 (2001), lest the Constitution's proscription against race-based districting become a prescription for it. Plaintiffs, therefore, must "untangle race" from permissible non-racial explanations, *Alexander*, 602 U.S. at 7, including "core preservation," *id.* And courts must presume lawmakers' good faith and reject gerrymandering claims when there is "evidence that could plausibly support" a non-racial explanation. *Id.* at 10. Here, as in *Alexander*, Plaintiffs never cleared that "especially stringent" standard. *Id.* at 11.

## A. Evidence of past §5 compliance is not evidence of present-day racial gerrymandering.

The district court replaced *Alexander*'s good-faith presumption with a bad-faith presumption on the most perverse grounds: because Jefferson County corresponded with DOJ to show its compliance with §5 of the VRA in past decades. That "history of the Commission's consistent report to DOJ of the effort to create and maintain two majority Black voting districts in Jefferson County," the district court held, "permits the inference that the Commission continued its decades-long practice in 2021." Op.105. That holding on this record clouds the constitutionality of districts not just in Jefferson County but across the country. This Court is likely to reverse for the following reasons.

***First***, the district court factually erred by conflating anodyne §5 correspondence with evidence of an ex-ante racial target. The court itself found that the 1985 consent

decree "did not provide explicit racial targets in Districts 1 and 2" when creating single-member districts. Op.14. That (correct) finding is irreconcilable with the court's later analysis, faulting the Commission for "racial thresholds established by the Commission in 1985," *id.* at 98, and a "65% threshold in the consent decree," *id.* at 117. The court had it right the first time. The county's §5 submission stated the "anticipated *effect*" of the 1985 change was that Black voters "will have a greater opportunity to elect 2/5 or 40% of the County Commission positions." DE169-2 at 3 (emphasis added). Similarly, in 2001, the only reference to "inten[t]" was the intent to equalize population. DE169-6 at 10. And by 2013, the VRA was not even discussed during redistricting. DE174 726:17-21. The county simply confirmed *afterward* that districts continued to comply with the VRA in a letter to DOJ, as required before *Shelby County v. Holder*, 570 U.S. 529 (2013). DE174 711:7-15; DE169-5 at 1080.

That record makes this case nothing like those relied upon. In *Cooper v. Harris*, 581 U.S. 285, 300 (2017), *contra* Op.105, undisputed evidence exposed North Carolina's 50% BVAP target. In *Miller v. Johnson*, 515 U.S. 900, 907 (1995), *contra* Op.104, Georgia capitulated to DOJ's "max-black" requirement to maximize majority-Black districts at the expense of all non-racial redistricting criteria. In *Clark v. Putnam County*, *contra* Op.107, the county's §5 submission reported that "black voting strength in Putnam County has been maximized" by including "every contiguous census block which would have the effect of increasing the black percentage in the two majority black voting districts." 293 F.3d 1261, 1275, 1267 & n.17 (11th Cir. 2002); *compare Chen v. City of Houston*,

206 F.3d 502, 519-20 (5th Cir. 2000) (rejecting §5 correspondence as sufficient evidence of racial predominance). Here, Jefferson County's §5 submissions simply reported the *resulting* racial demographics of redrawn districts so that DOJ could determine the extent of the changes and whether they would deny or abridge voting rights. That required routine correspondence is in no way evidence that race was "the criterion that … could not be compromised" in past decades, let alone for 2021. *Alexander*, 602 U.S. at 7.

**Second**, the court legally erred by concluding past §5 correspondence was sufficient to show race predominated. The court demeaned VRA-compliant districts as categorically unconstitutional "[r]emedial racial gerrymanders." Op.88. In the court's view, letters stating districts provide Black voters "with a greater opportunity to elect"— simply echoing the VRA—and providing data for DOJ to check the assertion revealed a decades-long effort to segregate voters. Op.14, 108, 109 n.41. This wrongly assumes that reporting a district's "over-65%" BVAP after redistricting is itself evidence of racial predominance *during* redistricting. Districts may result in "over-65%" BVAP when drawn for non-racial reasons—here, by anchoring two of the commission's five districts in the county's largest city of Birmingham. DE169-111 at 4. As the court correctly observed, "Districts 1 and 2 were 'formed out of the central area of [Jefferson County], primarily within the City of Birmingham,'" Op.14, and retained that geography over

9

time, Op.62.[3] As Plaintiffs' own expert testified, mapdrawers can draw districts resulting in a 65% BVAP by following such race-neutral districting criteria and "without thinking about race at all." DE172 183:21-184:13. Having created districts for such non-racial reasons, the Constitution imposes no further "affirmative obligation upon the legislature to avoid creating districts that turn out to be heavily, even majority, minority." *Cromartie*, 532 U.S. at 249.

To infer a racial target when other race-neutral explanations are evident disregards the presumption of legislative good faith. *Contra Alexander*, 602 U.S. at 10-11. No court ever invalidated the 1985 plan as a so-called "[r]emedial racial gerrymander," Op.88, or plans following the 1990, 2000, or 2010 Censuses. At most, the §5 submissions reveal an *awareness* of the racial makeup of districts *after* redistricting, "but it does not follow" from mere awareness "that race predominates in the redistricting process" then, *Miller*, 515 U.S. at 916, and certainly not now.

---

[3] The court described past changes as "track[ing]" Black residents, Op.38-39, 101, relying only on Plaintiffs' expert who testified he had no knowledge of the county's past §5 compliance, never examined "intent," and never reviewed the 2021 legislative record. DE173 303:21-305:7, 326:7-13, 334:1-3. Such reasoning replaces *Alexander*'s presumption of good faith with a presumption of bad-faith fortune-telling. Over time, Districts 1 and 2 had to expand geographically as their cores dramatically decreased in population. *See* DE169-75. They grew into municipalities already included in Districts 1 and 2. For example, the court faulted District 1 for growing into Center Point and District 2 for growing into Homewood and Bessemer, Op.123, 129-130, but portions of those municipalities were already part of Districts 1 and 2 in previous plans. DE177¶¶225, 265, 277, 337.

***Third***, even assuming race somehow predominated in past plans, it was the 2021 Enacted Plan that was on trial. And this Court has "rejected the argument that 'a racist past is evidence of current intent.'" *LWV of Fla. v. Fla. Sec'y of State*, 66 F.4th 905, 923 (11th Cir. 2023). There is no basis for time travel to adjudicate past commissioners' decades-old intent and then carry that intent forward to "condemn governmental action" today "that is not itself unlawful." *Abbott*, 585 U.S. at 603. To condone that "fundamentally flawed" approach, *id.* at 607, would disregard the presumption of legislative good faith and impermissibly "plunge federal courts into far-reaching expeditions regarding the sins of the past in order to question the laws of today," *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1226 n.21 (11th Cir. 2005) (en banc).

In sum, statements of the racial *effects* of past redistricting plans cannot be converted into statements of racial *purpose* in the present redistricting plan. A federal court approved the 1985 Plan. DE169-1 at 2; DE169-2 at 3. By 2013, it is undisputed that the VRA did not even come up during redistricting. DE174 726:17-21. Likewise in 2021. DE170-5. That record is nowhere near enough to condemn the Enacted Plan.

### B. The district court disregarded *Alexander*.

The district court failed to hold Plaintiffs to their burden to disentangle race from non-racial redistricting considerations. For example, it is undisputed that incumbent-commissioners had "legitimate political objectives," namely their stated desire to keep constituents by maximizing "core district retention." *Alexander*, 602 U.S. at 26, 34. The court relegated its application of *Alexander* to a footnote while blessing so-called

"illustrative" plans proffered by Plaintiffs' experts who prioritized different criteria at the expense of core retention, among other non-racial considerations. That same "serious flaw" infected plaintiffs' case in *Alexander. Id.* at 26. This Court is likely to reverse. Plaintiffs never ruled out the "possibility" that non-racial considerations explain the Enacted Plan. *Id.* at 20. "In light of the presumption of legislative good faith, that possibility is dispositive." *Id.*

### 1. Plaintiffs did not rule out core retention.

*Alexander* requires ruling out "core preservation" as a permissible explanation for districts' resulting racial demographics. *Id.* at 6-7, 20. Failing to do so "betrays a blinkered view" of redistricting because "[l]awmakers do not typically start with a blank slate." *Id.* at 27.

With a footnote, the district court excused Plaintiffs from that requirement by declaring that the "record here is different from the record in *Alexander* in significant respects." Op.179 n.44. The court never identified a difference. It said only that "core retention in this case does not represent a race-neutral redistricting criterion given the history of the 2013 map." *Id.* That "history" was simply past §5 compliance. *Id.* at 106. It is little different than South Carolina's past §5 compliance. The *Alexander* district court recounted how past plans split Charleston "to satisfy the then existing non-retrogression requirements of Section 5 of the Voting Rights Act" on the way to holding that the present-day split was racially gerrymandered. *S.C. NAACP v. Alexander*, 649 F. Supp. 3d 177, 190 (D.S.C. 2023). The Supreme Court reversed, and South Carolina's

past §5 compliance did not even warrant a footnote in the opinion. The Supreme Court did not require South Carolina to "start with a blank slate," 602 U.S. at 27, as the district court would have the Commission do. Instead, it held plaintiffs to their "especially stringent" evidentiary burden, including "rul[ing] out core retention." *Id.* at 11, 27. The same rules apply here, for the ultimate question in any racial gerrymandering case is the same: Does race or *something else* explain district lines? *See id.* at 7. There is no exception for jurisdictions formerly under preclearance.

It is undisputed that core retention explains the Enacted Plan. DE170-8 35:24-36:3, 38:6-12, 39:16-18, 45:8-10. Core retention exceeded 95% overall and 90% in each district. DE169-26 at 13, 24; DE170-16 at 7, 43. But repeating the reversible error from *Alexander*, Plaintiffs' experts simply ignored core retention in their pursuit of achieving "greater racial balance." 602 U.S. at 10; *see id.* at 27, 33. Of Plaintiffs' illustrative plans, only "Cooper D" attempted to control for core retention but still falls nearly 10% short overall and redraws Districts 1 and 4 so dramatically that their commissioners would be paired when seeking re-election. DE172 282:15-18; DE169-76; DE173

| Enacted | 95.1% |
|---|---|
| Fairfax | 68.2% |
| Cooper A | 70.2% |
| Cooper B | 61.9% |
| Cooper C | 62.9% |
| Cooper D | 85.7% |
| Cooper E | 71.2% |
| McCartan 1 | 50.8% |
| McCartan 2 | 62.8% |
| McCartan 3 | 58.2% |
| McCartan 4 | 65.1% |
| McCartan 5 | 64.4% |
| McCartan 6 | 71.2% |

328:13-14, 330:25-331:2, 333:19-20.[4] That 10% difference is worse than the "disqualifying" discrepancy between the core retention in Mr. Cooper's illustrative plan and Arkansas's congressional districts in the failed racial gerrymandering challenge in *Christian Ministerial Alliance v. Jester*, —F. Supp. 3d—, 2025 WL 1635282, at *5 (E.D. Ark. June 9, 2025) (three-judge court) (4.6% discrepancy); *see also Alexander*, 602 U.S. at 27 (rejecting 14% difference).

When Plaintiffs finally accounted for core retention, they proved it explains the Enacted Plan. Plaintiffs' rebuttal expert assembled thousands of computer-drawn plans with an overall core retention about as high or higher than the Enacted Plan. DE169-26 ¶36. Shown below, the resulting range of racial demographics of districts in those race-neutral simulations (grey bars) mirrors the resulting racial demographics of the Enacted Plan (blue triangles):

---

[4] Cooper D also exceeded the Commission's +/-1% population deviation standard, *compare* DE169-84 (2.28%), *with* DE174 660:7-10; and splintered Birmingham, *compare* DE169-85, *with* DE170-16 at 9, table 3. Either shortcoming further explains differences in resulting racial demographics "without factoring in race." *See Jester*, 2025 WL 1635282, at *4.

Figure 1: Racial Composition of Districts compared to Simulations



DE170-17 at 6. Meanwhile, districts in Plaintiffs' illustrative plans (multi-colored dots) were largely outliers. *See* DE170-17 at 5 (concluding Plaintiffs sacrificed core retention to achieve different racial outcomes).

This evidence went ignored. The district court relied instead on a bespoke plan-wide scoring system contrary to *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015), while inexplicably omitting Plaintiffs' expert's own testimony: Enacted districts are *not* outliers when accounting for core retention. DE174 641:20-23.

## 2. Plaintiffs did not rule out anchoring Districts 1 and 2 in Birmingham and other municipalities.

Districts 1 and 2 have been anchored in Birmingham since 1985 and cover nearly 95% of Birmingham today. DE169-97 at 3-4; DE169-111 at 4, 9; DE175 758:23-759:2; DE170-16 at 9, table 3.[5] Every change made to District 1 in the Enacted Plan is explainable by this long-time decision to anchor District 1 in the county's largest city. As the district court found, every precinct moved into District 1 included Birmingham neighborhoods. DE175 767:4-8; Op.62. Every alternative precinct that the court hypothesized could have moved instead would have added other municipalities *in lieu* of Birmingham, or exceeded population equality, or both. DE172 152:13-156:20. *Contra* Op.125. For example, the court faulted the Commission for not adding part of Pinson —never before included in District 1—and instead adding a neighboring precinct with mostly Birmingham residents. Op.122; DE170-16 at 16-17; DE172 121:24-122:7; DE174 670:18-671:5; DE175 770:5-9. That choice is evidence of redistricting based on municipal communities, not race.

As for District 2, the district court faulted the Commission for moving in three precincts with BVAPs ranging from 50.6% to 79.4%. Op.129-30; *see* DE170-16, figure 8.[6] But the court never accounted for the undisputed fact that those three changes

---

[5] By comparison, "Cooper D" relied upon throughout the district court's opinion splinters large parts of Birmingham into three districts. *See* Op.55.

[6] Other precincts added were predominantly white, with BVAPs ranging from 13% to 40%, and District 2's BVAP *declined* overall. DE170-16 at 22-23 & figure 8.

simply added more Birmingham, Bessemer, and Homewood residents to District 2—all municipalities long part of District 2. DE169-108 at 19; DE170-17 at-9, table 3; DE174 691:20-21; DE175:776:13-16.

The Enacted Plan's treatment of these communities is a non-racial explanation for the Enacted Plan's resulting racial demographics. *See, e.g.*, DE172 50:23-25 (Plaintiffs' expert testifying that keeping municipalities together is a common redistricting goal); DE175 769:10-14. There was no "affirmative obligation" to avoid these municipalities when re-populating districts to achieve what Plaintiffs deem a fairer racial balance; such a thing would itself violate the Constitution. *Cromartie*, 532 U.S. at 249.

### 3. Plaintiffs' illustrative plans ignore political considerations.

The Enacted Plan also has political explanations that Plaintiffs' failed to rule out. The Enacted Plan's high core retention was consistent with the fact that all five commissioners were incumbents seeking re-election and wished to retain their existing constituents. DE174 670:17, 689:21-22, 692:18-19, 697:20-22, 698:3-4, 712:20-22, 725:15-17; DE172 82:4-11; DE173 327:18-23; DE175 757:3-12. Plaintiffs' alternatives ignored that political reality. For example, "Cooper D" paired the District 1 and District 4 incumbents. DE173 328:13-14. And the Fairfax illustrative plan converted the

Commission President's district from Republican to Democratic. DE172 179:13-20.[7]

Plaintiff's alternatives show only that it is possible to draw different districts when prioritizing different political considerations, not that districts are racially gerrymandered. *Alexander*, 602 U.S. at 26.

### 4. Other non-racial considerations went ignored.

Evidence of other non-racial explanations for every change in the Enacted Plan went ignored; the Commission's post-trial briefing explained each one. *See* DE177¶¶252-381; DE183 at 131-62. Worse, the court relied on changes in the Enacted Plan that no Plaintiffs challenged as evidence of gerrymandering. The court criticized how the Enacted Plan reunified a previously split precinct (Oxmoor Valley). Op.137. Plaintiffs' expert did not dispute that reunifying split precincts was a non-racial explanation. DE172 95:2-10. The court called it "[t]elling[]" that a majority-white precinct in the northernmost part of the county (Warrior) was split. Op.132. Plaintiffs' expert said that this change, moving the district line to follow I-65 instead of a small creek, was "irrelevant" to his analysis. DE172 163:23-164:14. And while it was "particularly telling" to the court that a majority-white, 100-person precinct (Brookside) was moved from

---

[7] The district court also applauded the Fairfax illustrative plan for keeping nearly all municipalities whole while faulting splits in the Enacted Plan. Op.49, 118-19. But the Constitution does not prohibit municipal splits. *Alexander*, 602 U.S. at 7. And the court repeated Plaintiffs' error by faulting the Enacted Plan for splits that do not in fact exist. *See* DE183 at 114-15 (identifying Plaintiffs' identical error).

District 1 to District 3, Op.124, Plaintiffs never disputed that change was made to improve elections administration. DE183 at 135-36.

The district court dismissed all such non-racial explanations in one fell swoop as "post-hoc speculation." Op.128, 131, 133, 136, 138. But these non-racial explanations are not "post hoc." They are apparent from the map itself and borne out by the extensive trial record, including Plaintiffs' experts' testimony. Any other conclusion defies *Alexander*'s presumption of good faith and the requirement to draw inferences in lawmakers' favor when there are plausible non-racial explanations. *See Alexander*, 602 U.S. at 19-22.

Nothing better exemplifies these errors than the court's conclusion that District 2 was gerrymandered. District 2 is one of the two majority-Black districts anchored in Birmingham. In 2021, more white voters than Black voters were added to District 2. DE172 66:15-17, 71:23-25; DE175 782:15-17; DE169-38. Every change is explainable on non-racial grounds. *See* DE177¶¶301-56; DE183 at 151-62. In the face of that evidence, one of Plaintiffs' expert's testified that he did not "see demographic shifts in District 2 that evidence racial predomination." DE172 84:9-17. Despite all that, the court inferred bad faith based on one statement by District 2's commissioner *after* the whole Commission voted. *Cf.* Op.77-82, 120-21. In response to an accusation that she added "Republican" areas, DE170-8 at 31:17-22, District 2's commissioner recounted what she knew about the politics of discrete areas added to her district and then, for a few areas, racial demographics. DE170-8 39:1-40:19; *see also* DE177 ¶¶240-44, 355, 469;

DE183 at 143-44, 193-97. That passing statement is not the direct evidence of racial purpose that *Alexander* requires. *See* 602 U.S. at 8. An *awareness* of race suggests "nothing nefarious." *Id.* at 37. Nor was that statement sufficient to establish unconstitutional intent by the Commission as a whole. *See LWV*, 32 F.4th at 1373. Reading that statement as evidence of intentionally packing Black voters into District 2 is contrary to the undisputed reality that District 2 *declined* in Black population. DE170-16 at 22.

*

The decision below is contrary to *Alexander* and reduces racial gerrymandering claims to strict liability, faulting lawmakers for the *resulting* racial demographics of neutrally drawn districts. There is no such constitutional violation.

## II.  The Equities Favor a Stay.

### A.  A stay preserves the status quo of neutrally drawn districts.

The harms that would result without a stay outweigh any asserted harm a stay would impose. A stay is also in the public interest. *See Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020) (governing body's "interest and harm merge with the public interest").

Weighing in favor of a stay, the "inability" to conduct elections under a "duly enacted" redistricting plan "clearly inflicts irreparable harm" on the county and its residents. *See Abbott*, 585 U.S. at 602 n.17. That harm is most severe here, where the remedial stage will see Black voters removed from Districts 1 and 2 on account of their race. *See, e.g.*, Op.133, 135 (identifying precincts that could be moved into districts to reduce

BVAP). That is "offensive and demeaning," *Miller*, 515 U.S. at 911-12, even when for "remedial" purposes. *Shaw*, 517 U.S. at 905. Equity favors maintaining the existing districts pending an appeal of the novel theory that past §5 compliance was "[r]emedial racial gerrymandering," Op.88, sufficient to taint present-day districts.

On the other side of the ledger, Plaintiffs contend that they should not be penalized for their delay because their counsel "undertook extraordinary work related to redistricting across the state of Alabama" in other cases involving other parties and other redistricting plans. DE201 at 22, 24. But that decision to prioritize those cases before this one cannot be reconciled with assertions of irreparable harm. Plaintiffs waited 17 months after the Enacted Plan's adoption to sue. DE1. In contrast, the Commission has defended against their suits with utmost speed. The Commission moved for summary judgment, arguing the case could be completely resolved in 2024 and then tried this case in January 2025, days after summary judgment was denied, and then submitted its post-trial brief two weeks later. *See* DE99; DE164; DE172-75; DE177. Then seven months passed before a decision issued. The Commission's opportunity for appellate review should not be foreclosed because of Plaintiffs' decision to wait well over a year to sue and the delay between trial and a decision. *See Grace, Inc. v. City of Miami*, 2023 WL 5286232, at *2 (11th Cir. Aug. 4, 2023) (nine-month delay warranted stay); *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanagh, J., concurring).

**B.** *Purcell* **warrants a stay.**

Federal courts "'should not enjoin state election laws in the period close to an election.'" *LWV*, 32 F.4th at 1371. Here, the order enjoining use of the Enacted Plan comes too close to "important, interim deadlines." *Thompson v. Dewine*, 959 F.3d 804, 813 (6th Cir. 2020). Deadlines for prospective candidates are looming. The remaining time is little different than other cases warranting *Purcell* stays. *See, e.g.*, *Robinson v. Callais*, 144 S. Ct. 1171 (2024) (granting stay in May, in advance of June and July candidate-qualifying deadlines and November primary); *accord Thompson*, 959 F.3d at 807 & n.1, 813 (staying injunction issued six weeks before election deadline). It leaves *no time* for this Court to review the injunction or the lawfulness of any substitute remedial plan before 2026 election deadlines commence. *Cf. Petteway v. Galveston Cnty.*, 87 F.4th 721, 723 (5th Cir. 2023) (en banc) (Oldham, J., concurring) (factoring time for appellate review into *Purcell* calculus).

Districts to be used in the 2026 commission elections must be final by October 20—and even that timing affords prospective candidates little time to comply with election deadlines. Stephenson Dec. ¶21. No later than November 3, 2025, all prospective candidates must live in districts they seek to represent. *Id.* ¶¶7, 17; Ala. Code §45-37-72(d). Candidates must have sufficient time to comply with that residency requirement before then. Additionally, the county needs time to inspect and address errors in redrawn district lines and conform them to current precinct lines. Stephenson Dec. ¶19

(identifying possible delays). The public should also be afforded at least two weeks' time to see districting changes. *Id.* ¶20; *see* Ala. Code §11-3-1.1(c).

Due in part to the eight-month gap between trial and last week's permanent injunction, insufficient time remains to substitute districts before then. The district court initially ordered the parties to submit a "joint report on the development of a remedial redistricting plan" on October 16, Op.139, leaving only four days' time to litigate and implement new districts and no time for appellate review. Then during a September 24 hearing, the court indicated remedial proceedings will commence immediately, which ought to entail Plaintiff-proposed plans,[8] with briefing and supporting expert reports, possible depositions, a hearing, and a remedial order. Ordinarily such proceedings "have taken months." Emergency Stay App. at 8, *Robinson v. Callais*, No. 23A994 (U.S.). Only a stay allows the parties to adequately litigate remedies and appeal.

## CONCLUSION

This Court should grant a stay pending appeal.

Dated: September 25, 2025

Respectfully submitted,

/s/ Taylor A.R. Meehan

Theodore A. Lawson, II
JEFFERSON COUNTY ATTORNEY'S OFFICE
716 Richard Arrington Jr. Blvd. North
Room 280
Birmingham, AL 35203
(205) 325-5688

Taylor A.R. Meehan*
Rachael C. T. Wyrick*
Marie E. Sayer*
Soren Geiger
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700

---

[8] Even if the Commission wished to enact a remedial districting plan and forgo this stay motion, no time remains. *See* DE31 (explaining 2021 redistricting took 60-plus days, including two-week notice requirement).

lawsont@jccal.org

Michael Taunton
BALCH & BINGHAM LLP
1901 Sixth Ave. N., Suite 1500
Birmingham, AL 35203
(205) 226-3451
mtaunton@balch.com

Arlington, Virginia 22209
(703) 243-9423
taylor@consovoymccarthy.com
rachael@consovoymccarthy.com
mari@consovoymccarthy.com
soren@consovoymccarthy.com

Patrick Strawbridge*
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(703) 243-9423
patrick@consovoymccarthy.com

*Pro hac vice*
*Counsel for Defendant*

**CERTIFICATE OF COMPLIANCE**

This brief complies with Rule 27(d)(2)(A) because it contains 5,192 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it is prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

Dated: September 25, 2025                                 */s/ Taylor A.R. Meehan*

**CERTIFICATE OF SERVICE**

I filed this brief on the Court's electronic filing system, which will email everyone requiring notice.

Dated: September 25, 2025                                 */s/ Taylor A.R. Meehan*