No. 25-13253-J
(*consolidated with* No. 25-13254-J)

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

CARA MCCLURE, ET AL,

*Plaintiffs-Appellees*,

v.

JEFFERSON COUNTY COMMISSION

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Northern District of Alabama, No. 2:23-cv-00443 (Haikala, J.)

**APPELLEES' RESPONSE TO APPELLANT'S EMERGENCY
MOTION TO STAY DISTRICT COURT'S PERMANENT INJUNCTION**

Kathryn Sadasivan
Brenda Wright
NAACP Legal Defense and
Educational Fund, Inc
40 Rector Street, 5th Floor
New York, NY 10006
Tel: (212) 965-2200
Fax: (212) 226-7592
ksadasivan@naacpldf.org
bwright@naacpldf.org

Kacey Mordecai
NAACP Legal Defense and
Educational Fund, Inc
700 14th Street N.W., Ste. 600
Washington, DC 20005
Tel: (202) 682-1300
kmordecai@naacpldf.org

October 3, 2025

*Counsel for Appellees*

(*Additional Counsel listed on inside cover*)

Daniel Hessel
Samuel Davis
Election Law Clinic
Harvard Law School
6 Everett Street, Suite 4105
Cambridge, MA 02138
Tel: (917) 403-4976
dhessel@law.harvard.edu
sadavis@law.harvard.edu

Nicki Lawsen
WIGGINS CHILDS PANTAZIS
FISHER & GOLDFARB, LLC
301 19th Street North
Birmingham, AL 35203
Phone: (205) 341-0498
Fax: (205) 254-1500
nlawsen@wigginchilds.com

*Additional Counsel for Appellees*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Per Rule 26.1 and Eleventh Circuit Rule 26.1, the undersigned certifies that

the following may have an interest in the outcome of this appeal:

1. Addoh-Kondi, Alexia, *Addoh-Kondi Plaintiff-Appellee*

2. Alabama State Conference of the NAACP, *McClure Plaintiff-Appellee*

3. Bernstein, C'Zar, *Former counsel for Defendant-Appellant*

4. Blacksher, James, *Counsel for Addoh-Kondi Plaintiffs-Appellees*

5. Bonner, Cynthia, *Addoh-Kondi Plaintiff-Appellee*

6. Brown, Ja'Nelle, *Addoh-Kondi Plaintiff-Appellee*

7. Carter, Brittany, *Counsel for McClure Plaintiffs-Appellees*

8. Carroll, Donald, *Counsel for Defendant-Appellant*

9. Clemon, U.W., *Counsel for Addoh-Kondi Plaintiffs-Appellees*

10. Geiger, Soren, *Counsel for Defendant-Appellant*

11. Greater Birmingham Ministries, *McClure Plaintiff-Appellee*

12. Grisafi, Lily, *Former counsel for McClure Plaintiffs-Appellees*

13. Haikala, Madeline, *United States District Judge (N.D. Ala.)*

14. Hall, Eric, *Addoh-Kondi Plaintiff-Appellee*

15. Hansen, Michael, *Addoh-Kondi Plaintiff-Appellee*

16. Hessel, Daniel, *Counsel for McClure Plaintiffs-Appellees*

17. Juarez, Julia, *Addoh-Kondi Plaintiff-Appellee*

18. Lane, Kathleen, *Former counsel for Defendant-Appellant*

19. Lawsen, Nicki, *Counsel for McClure Plaintiffs-Appellees*

20. Lawson, II, Theodore, *Counsel for Defendant-Appellant*

21. Long, Charles, *Addoh-Kondi Plaintiff-Appellee*

22. McClure, Cara, *McClure Plaintiff-Appellee*

23. Meehan, Taylor, *Counsel for Defendant-Appellant*

24. Metro-Birmingham Branch of the NAACP, *McClure Plaintiff-Appellee*

25. Mordecai, Kacey-Ann, *Counsel for McClure Plaintiffs-Appellees*

26. Muhammad, William, *Addoh-Kondi Plaintiff-Appellee*

27. Randall, Fred, *Addoh-Kondi Plaintiff-Appellee*

28. Rice, Richard, *Counsel for Addoh-Kondi Plaintiffs-Appellees*

29. Ross, Deuel, *Counsel for McClure Plaintiffs-Appellees*

30. Rouco, Richard, *Counsel for Addoh-Kondi Plaintiffs-Appellees*

31. Sadasivan, Kathryn, *Counsel for McClure Plaintiffs-Appellees*

32. Sayer, Marie, *Counsel for Defendant-Appellant*

33. Sheikh, Uruj, *Counsel for McClure Plaintiffs-Appellees*

34. Smith, Tammie, *Addoh-Kondi Plaintiff-Appellee*

35. Strawbridge, Patrick, *Counsel for Defendant-Appellant*

36. Taunton, Michael, *Counsel for Defendant-Appellant*

37. Walker, Dorman, *Former counsel for Defendant-Appellant*

38. Walker, Robert, *Addoh-Kondi Plaintiff-Appellee*

39. Wright, Brenda, *Counsel for McClure Plaintiffs-Appellees*

40. Wyrick, Rachael, *Counsel for Defendant-Appellant*

Plaintiffs-Appellees further state that no publicly traded company or corporation has an interest in the outcome of the case or appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ................................................................C-1

TABLE OF AUTHORITIES ................................................................ ii

BACKGROUND .................................................................................. 2

LEGAL STANDARD ......................................................................... 5

ARGUMENT....................................................................................... 7

   I.   The Commission is Unlikely to Succeed on the Merits. ............................ 7

     A.   The District Court Appropriately Weighed Direct and Circumstantial
        Evidence to Find that Race Predominated in the 2021 Plan. .................... 8

     B.   The District Court Did Not Err in Refusing to Credit Appellant's
        Post-Hoc Justifications, which were Unsupported by Evidence. ..............13

   II.   The Equities Favor Plaintiffs. ................................................................18

     A.   Plaintiffs, and the Public, will be Irreparably Harmed if the
        Commission is Permitted to Use Racially Gerrymandered Districts
        in the 2026 Election. ................................................................18

     B.   Purcell Does Not Apply. ........................................................20

CONCLUSION ..................................................................................23

CERTIFICATE OF COMPLIANCE ..................................................25

CERTIFICATE OF SERVICE.............................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez*,
 585 U.S. 579 (2018)............................................................................. 12, 17, 19

*Ala. Legis. Black Caucus v. Alabama*,
 575 U.S. 254 (2015)............................................................................. 10, 18, 22

*Alexander v. S.C. State Conf. of NAACP*,
 602 U.S. 1 (2024)............................................................................. 3, 10, 11, 15

*Allen v. Milligan*,
 144 S. Ct. 476 (2023)................................................................................. 1, 21

*Allen v. Milligan*,
 599 U.S. 1 (2023).............................................................................................18

*Anderson v. Bessemer City*,
 470 U.S. 564 (1985)............................................................................................7

*Bethune-Hill v. Va. State Bd. of Elections*,
 141 F. Supp. 3d 505 (E.D. Va. 2015) ..............................................................16

*Bethune-Hill v. Va. State Bd. of Elections*,
 580 U.S. 178 (2017)................................................................... 12, 15, 16, 18

*Bush v. Vera*,
 517 U.S. 952 (1996)................................................................................. 10, 11

*Chen v. City of Houston*,
 206 F.3d 502 (5th Cir. 2000)............................................................................17

*Clark v. Putnam Cnty.*,
 293 F.3d 1261 (11th Cir. 2002) ......................................................................10

*Cooper v. Harris*,
 581 U.S. 285 (2017).......................................................................... 6, 7, 11, 12

*Democratic Exec. Comm. of Fla. v. Lee*,
915 F.3d 1312 (11th Cir. 2019) ............................................................ 6, 20, 22

*Ga. Muslim Voter Project v. Kemp*,
918 F.3d 1262 (11th Cir. 2019) ...................................................................... 19

*GRACE, Inc. v. City of Miami*,
685 F.Supp.3d 1365 (S.D. Fla. 2023) ............................................................ 16

*Jacksonville Branch of NAACP v. City of Jacksonville*,
635 F. Supp. 3d 1229 (M.D. Fla. 2022) ("*Jacksonville I*") .......................... 17

*Jacksonville Branch of NAACP v. City of Jacksonville*,
No. 22-13544, 2022 WL 16754389 (11th Cir. Nov. 7, 2022)
("*Jacksonville II*") ........................................................................*passim*

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) .......................................................................... 20

*McCrory v. Harris*,
577 U.S. 1129 (2016) ...................................................................................... 21

*Merrill v. Milligan*,
142 S. Ct. 879 (2022) ...................................................................................... 22

*Miller v. Johnson*,
515 U.S. 900 (1995) .............................................................................. 8, 12, 16

*New Hampshire v. Maine*,
532 U.S. 742 (2001) ........................................................................................ 23

*Nken v. Holder*,
556 U.S. 418 (2009) ................................................................................ 1, 6, 19

*North Carolina v. Covington*,
585 U.S. 969 (2018) ................................................................................ 1, 21, 22

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) .............................................................................................. 2

*Rose v. Raffensperger*,
143 S. Ct. 58 (2022) ................................................................................... 2, 21

*Scott v. Roberts*,
    612 F.3d 1279 (11th Cir. 2010) .......................................................... 19

*Singleton v. Allen*,
    691 F.Supp.3d 1343 (N.D. Ala. 2023) ............................................... 20

*United States v. Stein*,
    881 F.3d 853 (11th Cir. 2018) ............................................................ 23

*Va. House of Delegates v. Bethune-Hill*,
    586 U.S. 112 (2019) ............................................................................ 21

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ............................................................................ 17

## Other Authorities

Fed. R. Civ. P. 52 ...................................................................................... 6

The next election in Jefferson County is over a year away. No court has *ever* stayed an injunction based on the extraordinary claim that thirteen months before the next election is "too close" to grant relief. *See Allen v. Milligan*, 144 S. Ct. 476 (2023) (declining to stay an injunction issued over a year before the next general election). And with good reason: with so much time remaining before Election Day, "the primary reason for applying th[e] [*Purcell*] standard—risk of voter confusion— [is] lacking." *Jacksonville Branch of NAACP v. City of Jacksonville*, No. 22-13544, 2022 WL 16754389 at *3 (11th Cir. Nov. 7, 2022) ("*Jacksonville II*").

Each *Nken v. Holder* factor favors Appellees. 556 U.S. 418, 426 (2009). Appellant is unlikely to succeed on the merits: after a full trial, the district court found that the substantial weight of evidence established that the Jefferson County Commission engaged in unconstitutional racial gerrymandering. The district court found each of Appellant's alleged nonracial explanations for its districting decisions "not credible." Op.107,131. The equities also clearly favor Appellees: Courts have a "duty to cure illegally gerrymandered districts through an orderly process in advance of elections." *North Carolina v. Covington*, 585 U.S. 969, 977 (2018). Appellees and other voters whom Appellant subjected to unconstitutional discrimination will suffer irreparable harm from a stay. In contrast, Appellant is not harmed by complying with the Constitution, which is in the public interest.

1

Nor can Appellant invoke *Purcell v. Gonzalez*, 549 U.S. 1 (2006) based on a brand-new affidavit that contradicts the same witness's earlier testimony. *Rose v. Raffensperger*, 143 S. Ct. 58 (2022) (vacating stay where state "could not fairly have advanced" *Purcell*-based argument "in light of his previous representations . . .that the schedule on which . . . district court proceeded was sufficient to enable effectual relief" ahead of elections). This Court should deny Appellant's request for a stay.

## BACKGROUND

In 2021, Appellant Jefferson County Commission enacted a districting plan ("2021 plan") that packed Black voters into two supermajority Black districts, with 76.3% and 64.1% Black voting-age population (BVAP) in Districts 1 and 2, respectively. Op.48. At a public hearing before the plan's passage, Commissioners were explicit about the role race played in the map-drawing process. One commissioner who helped draw the 2021 plan said she walked around her district to look at "folks in the[ir] face" to "know what [she was] getting," and stated her district (CD2) was populated with more African Americans than needed to comply with the Voting Rights Act (VRA). Op.77-81.

For decades, the Commission drew noncompact districts that eschewed traditional criteria and "placed many of the neighborhoods and suburbs to which Black voters moved between 1990 and 2020 into Districts 1 and 2." Op.37. Over the years, the boundaries of each district shifted to follow Black population growth,

extending from majority-Black Birmingham to the northern portion of the county towards suburbs with growing Black populations. *Id*.

The Commission's 2021 plan followed a decades-long pattern. From 1993 to 2013, the Commission described its redistricting plans to the Justice Department as creating "districts containing African American majorities in excess of 65%." Op.102. During this period, the Commission admitted it made changes to each district to get "close to the ideal district population without significantly changing the ratio of [B]lack and white population within the districts." Op.27,30,31. Consistent with this stated goal, each Commission-enacted plan maintained Black populations above 65% in Districts 1 and 2. *Id.* The Commission never considered nor analyzed whether those explicit racial thresholds were necessary to comply with the VRA. And no commissioner *ever* claimed that any plan was designed to anchor two districts in Birmingham. *Id*.; Op.107.

In compliance with *Alexander v. S.C. State Conf. of NAACP*, 602 U.S. 1, 7 (2024)*,* the district court thoroughly analyzed the facts and afforded the Commission the strong presumption it adopted the 2021 plan in good faith. Indeed, in an earlier decision, the court carefully examined and repeatedly cited *Alexander* as its basis for denying both parties' motions for summary judgment. Doc.164(p.62). After trial, the district court again carefully applied the presumption of good faith in weighing the evidence. Op.93. Only after a four-day trial, involving testimony from 10 witnesses

3

and almost 150 exhibits, did the district court decide in a thorough 136-page opinion that the Commission violated the Constitution. *Id*.

The district court exhaustively described how the direct and circumstantial evidence overcame the presumption of good faith. Op.8-86. While the court considered the §5 correspondence, it did not treat it as dispositive evidence of racial predominance. Rather, the court appropriately concluded that the Commission's past correspondence was circumstantial evidence of the Commission's intent in 2021. The court correctly found this past correspondence corroborated other evidence—including expert analyses of the plans, historic and present-day district shapes, Commissioners' 2021 comments, and trial testimony—that proved the Commission added Black voters to Districts 1 and 2, excluding them from other districts predominately based on race. *Id*.

In April 2023, Plaintiffs sued the Commission and, in July, moved for a preliminary injunction, Doc.26. In December 2023, the district court denied that motion. Doc.54-28. With the November 2026 elections almost three years away, the Parties moved for summary judgment. The district court denied summary judgment to both parties based on the presumption of legislative good faith in January 2025. Doc.164. Three days later, the court commenced a four-day trial. *See* Docs.172-175.

On September 16, 2025, more than a year before the 2026 elections, the Court issued its opinion declaring the 2021 plan unconstitutional. Doc.191. Among other

evidence, the court found that alternative maps better respected traditional redistricting criteria, like municipal boundaries, than the 2021 plan, *and* "would not result in a change to the partisan composition of the 2021 plan." Op.84-85. The court enjoined use of the 2021 plan and required the Parties to devise a remedial schedule. Op.139.

On September 18, when Appellant moved the district court to stay the injunction pending appeal it attached a new, self-serving declaration from Barry Stephenson, Chair of the County Board of Registrars. Doc.194. In his declaration, Stephenson claimed, for the first time, that a remedial plan must be in place by October 20, 2025, to be used in the November 2026 elections. Doc.194-1. But the declaration contradicts Stephenson's August 2023 testimony that the parties had until one month before the candidate qualifying deadline—or December 23, 2025—to adopt a final map. Doc.31(¶50); *See* Doc.191. At no point during more than two years of proceedings–including multiple conferrals, status conferences, and scheduling orders, *see, e.g.* Doc.59; Doc.113—did Appellant ever suggest the Parties' agreed-upon schedule would leave insufficient time for a remedy.

## LEGAL STANDARD

A stay pending appeal is an "extraordinary remedy," *Garcia-Mir v. Meese*, 781 F.2d 1450, 1455 (11th Cir. 1986), and "an intrusion into the ordinary processes of administration and judicial review . . . not a matter of right." *Nken,* 556 U.S. at

425-27. "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433-34 (citations omitted).

The Court must consider four factors: (1) whether Appellant has made a strong showing it is likely to succeed on the merits, (2) whether Appellant will be irreparably injured absent a stay, (3) whether issuance of the stay will substantially injure other parties interested in the proceeding, and (4) where the public interest lies. *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1317 (11th Cir. 2019) ("*DECF*"). "The first two factors are the most critical" *Id.* To carry its burden, Appellant must show "more than the mere possibility of success on the merits or of irreparable injury." *Id.*

A reviewing court owes "significant deference" to a district court's factual findings, which cannot be set aside unless they are clearly erroneous. *Cooper v. Harris*, 581 U.S. 285, 293, 298-99 (2017); *see also* Fed.R.Civ.P.52(a)(6). It "affirms a trial court's factual finding as to racial predominance so long as the finding is 'plausible'; it reverses only when 'left with the definite and firm conviction that a mistake has been committed.'" *Cooper*, 581 U.S. at 288. In assessing plausibility, a reviewing court "gives singular deference to a trial court's judgments about the credibility of witnesses." *Id.* (citation omitted). A finding that is "plausible" in light

6

of the full record—even if another is equally or more so—governs. *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985).

## ARGUMENT

### I.    The Commission is Unlikely to Succeed on the Merits.

Appellant ignores or misrepresents the voluminous evidence the district court considered in its careful factual findings, credibility determinations, and ultimately, its determination that the presumption of good faith had been overcome and race predominated in the 2021 plan.

To succeed in a racial gerrymandering case, a plaintiff must prove that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Cooper*, 581 U.S. at 291 (citation omitted). This "entails demonstrating that the legislature 'subordinated' other factors—compactness, respect for political subdivisions, partisan advantage, what have you—to 'racial considerations.'" *Id.* (citation omitted). The "good faith of a state legislature must be presumed." *Miller v. Johnson*, 515 U.S. 900, 915 (1995).

The district court began with that presumption. Op.93. It exercised extraordinary caution, given the presumption, weighing inferences that could *plausibly* support multiple conclusions in favor of the Commission. *See, e.g.*, Op.90. And the court earlier denied Plaintiffs' motion for summary judgment to give effect

7

to the presumption given the fact intensive nature of the racial predominance inquiry. Doc.164(p.62). Only after the district court carefully assessed Plaintiffs' and Defendant's witnesses' credibility and the direct and circumstantial evidence did it find Plaintiffs overcame that presumption. Op.93-108.

Appellant cannot show the district court clearly erred in its exhaustive fact and credibility findings, nor in its weighing of the direct and circumstantial evidence.

## A. The District Court Appropriately Weighed Direct and Circumstantial Evidence to Find that Race Predominated in the 2021 Plan.

The district court properly relied on significant direct evidence of the Commission's race-based motive for enacting the 2021 plan. Appellant incorrectly claims the decision was based principally on an inference about the Commission's motives derived from "anodyne §5 correspondence" from years past. This mischaracterizes the decision below in three ways:

*First*, the district court considered direct evidence from 2021 of two Commissioners' explicit references to the race-based reason for adding voters to their districts. They explained the granular, race-based decisions the Commission made when deciding what populations to include or exclude in the five districts in 2021. *See, e.g.*, Op.79,81,120-122 (finding decision to add Rosedale to District 2 in 2021 created odd shape and noting Commissioner who drew 2021 plan's statement she "pulled – Rosedale[...] a 99.2 percent Black community."). The direct evidence

8

also included statements at a public hearing where the Commissioner who drew the 2021 plan said she walked around to look at "folks in the[ir] face" to "know what [she was] getting" in her district. Op.77-79. Witnesses understood the Commissioner to be referring to voters' race. Op.79; Doc.173(487:5–10). This Commissioner also claimed her district included more African Americans than she needed to be elected. Op.81. These statements "underscore the predominant role of race" in 2021 redistricting. Op.120.

Moreover, two other commissioners who voted for the 2021 plan were commissioners in 2013. One was the Commission's president, and the other announced the Commission's intention in 2021 to retain the 2013 district lines to the highest degree possible. Op.105; Doc.178(p.19). Thus, the district court considered direct statements from Commissioners to determine whether race predominated. *See Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 273 (2015) ("*ALBC*") (legislators' statements about goal to maintain existing racial percentages in majority-minority districts was evidence of racial gerrymandering); *Clark v. Putnam Cnty.*, 293 F.3d 1261, 1267 (11th Cir. 2002) (relying on Commissioners' statements as direct evidence of race-based apportionment). The court's conclusions were bolstered by unrebutted evidence that the Commission had racial data, but not partisan or election data, during the 2021 redistricting. Op.47; *Bush v. Vera*, 517 U.S. 952, 962 (1996) (strict scrutiny applied when state neglected traditional criteria,

sought to create majority-minority districts, and used detailed racial data without data on party registration or turnout); *Alexander*, 602 U.S. at 7 n.1 (quoting *Miller*, 515 U.S. at 914) (racial predominance established when a legislative body "used 'race as a proxy' for 'political interest[s].'"). The Commission's redistricting software does not show voters' partisan preferences because Alabama does not register voters by party. Op.47. Unrebutted evidence showed the Commission used the same software and drawing process in the 2013 redistricting cycle. *Id*. And Appellant acknowledged the Commission has not raised a partisanship defense, and that doing so would be difficult given Alabama law. Doc.156(87:12-16, 91:1-11).

*Second*, the court ruled out "politics" as a potential explanation due to *both* the direct and circumstantial evidence, and Appellant's acknowledgment that the Commission had not raised a partisan defense at any stage and that mounting one was not possible given Alabama law. *See* Docs.57, 58; Doc.156(87:12-16,91:1-11). Moreover, the court found Plaintiffs' alternative maps would better respect traditional redistricting criteria and produce the same partisan makeup for the Commission without reliance on racial targets. Op.84-85. This constitutes strong evidence that race rather than partisanship drove the districting decisions. *See Alexander*, 602 U.S. at 34 ("an alternative map can 'go a long way' toward helping plaintiffs disentangle race and politics").

*Third*, it remains undisputed that the Commission, in §5 correspondence from 1993 to 2013, described drawing "districts containing African American majorities in excess of 65%," to bring "each district close to the ideal district population without significantly changing the ratio of black and white population within the districts." Op.27,30,31. Indeed, each plan maintained those Black population thresholds in Districts 1 and 2 and the Black-to-white population ratios in Districts 3, 4, and 5. *Id.* The district court treated this *only* as evidence of the Commission's motive in redistricting between 1993 and 2013. Op.94; *see also Cooper*, 581 U.S. at 318 (direct evidence of racial gerrymandering could include 75% BVAP target); *Bush*, 517 U.S. at 960-61 (§5 submissions were direct evidence); *Miller*, 515 U.S. at 919 (same). The district court considered the §5 correspondence only alongside evidence that the Commission consistently adjusted the lines of the majority-Black districts to follow Black population growth beyond Birmingham, which resulted in irregular district shapes and split municipalities along racial lines. Op.110-18.

Appellant claims "[t]he court demeaned VRA-compliant districts as categorically unconstitutional "[r]emedial racial gerrymanders." AppellantBr.-16. Not so. The court carefully considered unrebutted evidence showing the Commission never analyzed what the VRA would require nor considered voter turnout – not in 1993, 2003, 2004, 2013 or 2021. Op.20, 27, 30, 31. Nor did the Commission analyze the level of racially polarized voting in Jefferson County in

11

2021. Doc.164(p.22-23) (VRA never "came up"). In *Cooper,* the Supreme Court found that a district with a 52.7% BVAP was not narrowly tailored because the state had done no analysis demonstrating that a target over 50% was necessary. *Cooper*, 581 U.S. at 303-04. Here, the Commission *never* undertook any "functional analysis of the electoral behavior within the particular election district" to justify packing Black voters into supermajority districts, *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 194 (2017) (cleaned up), or any "pre-enactment analysis with justifiable conclusions" to show that the districts in the past or present plans satisfied the VRA, *Abbott v. Perez*, 585 U.S. 579, 621 (2018).

The court did not treat the robust §5 evidence as dispositive or consider it in isolation. Op.93-94. Appellant and *Amici* simply elide robust summary judgment briefing and argument, thousands of pages of evidence, and four days of trial testimony describing Plaintiffs' direct and circumstantial evidence supporting the court's careful findings. Op.33-86. The district court compared demographic changes in Jefferson County between 1985 and 2021. It concluded the Commission placed non-Birmingham neighborhoods, which were majority-white in 1985 but that Black voters had moved into between 1990 and 2020, into Districts 1 and 2 following Black population growth. Op.37; *compare* Doc.169-113, *with* Doc.169-114, Doc.169-116. The record shows the changing demographics of these districts was widely understood by Jefferson County residents, including the Commissioners. *Id.*

The district court found Plaintiffs and Plaintiffs' expert's testimony describing these demographic shifts credible and that it corroborated the evidence of racial predominance in the §5 submissions. *See, e.g.*, Op.37.

Although Appellant repeatedly glosses over this mountain of evidence either by ignoring it, *see* Doc.194, or addressing it in isolation, Doc.156(112:23-113:11), the court appropriately considered circumstantial evidence and direct evidence holistically to conclude that Plaintiffs had overcome the presumption of good faith and demonstrated racial predominance. The court's careful assessment of undisputed facts and direct and circumstantial evidence is entirely consistent with *Alexander*.

## B. The District Court Did Not Err in Refusing to Credit Appellant's Post-Hoc Justifications, which were Unsupported by Evidence.

The district court found that adherence to traditional districting principles and the Commission's stated goals did not explain the racial packing in the 2021 plan. *See, e.g.*, Op.52-58. The court compared adherence to traditional principles—including compactness, contiguity, and preserving political subdivisions—in the 2021 plan with Plaintiffs' alternatives. It found the Commission consistently moved majority-Black municipalities outside Birmingham into Districts 1 and 2, Op.110-11, and split municipalities across districts predominately along racial lines, Op.118. The court weighed district-by-district and precinct-by-precinct evidence demonstrating that precincts were moved into and out of districts, or split into

13

districts, based on race. Op.122-38. The court also carefully reviewed the evidence that the Commission's decision to maintain the 2013 districts to the highest degree possible was not race neutral, and even if it were, it did not explain the extreme racial composition or race-based municipal splits in the 2021 Plan. Voluminous evidence also led the district court to the obvious and uncontroverted conclusion that "politics" could not and did not explain the Commission's districting decisions in 2021 or any prior redistricting cycle.

*First*, the district court appropriately refused to credit the Commission's post-hoc explanation that it was trying to anchor two districts in Birmingham or that political considerations like keeping constituents drove its decision-making in 2021. It found no evidence indicating that these factors motivated the Commission. *Compare* AppellantBr.16-17; Doc.156(82:19-83:9) *with Alexander*, 602 U.S. at 14 (legislative redistricting guidelines explicitly sought to protect incumbents and increase Republican advantage in challenged district). Instead, the court found extensive evidence about the criteria the Commission *did* consider and concluded that race predominated. *Alexander* does not countenance a legislature inventing an after-the-fact justification for gerrymandering. "The racial predominance inquiry concerns the actual considerations that provided the essential basis for the lines drawn, not post hoc justifications the legislature in theory could have used but in reality did not." *Bethune-Hill*, 580 U.S. at 799. Nor does *Alexander* require plaintiffs

14

to disprove every *possible* explanation absent evidence indicating that a proffered explanation is *plausible.*

The *only* justifications for the district lines offered by the Commission in 2021 were to equalize population within a +/-1% population variance and to retain the 2013 districts to the highest degree possible. Op.40-42,105; Doc.178(p.19). Nowhere in the §5 correspondence nor the 2021 record did the Commission indicate any plan was adopted to anchor two districts in Birmingham. *Id.* That argument was advanced only after the fact, is unsupported by any evidence, and was rejected as not credible by the district court. *Compare* AppellantBr.-16-17, *with* Doc.156(82:19-83:9), Op.46,107-09 (finding Commission did not attempt to avoid splitting municipalities and split Birmingham among all five districts).

*Second*, the district court found that the supposedly race-neutral goal of core retention failed to explain the 2021 plan. Op.61, 71, 127-28. Facially race neutral redistricting criteria may result in racial gerrymandering when they "perpetuate" existing unconstitutional districts. *Bethune-Hill v. Va. State Bd. of Elecs.*, 141 F.Supp.3d 505, 545-46 (E.D. Va. 2015) ("[C]ore retention holds a special place in the predominance balance. . . . [because it] may be used to insulate the original basis for the district boundaries"), *aff'd in part and vacated in part*, 580 U.S. 178 (2017); *GRACE, Inc. v. City of Miami*, 685 F.Supp.3d 1365, 1373 (S.D. Fla. 2023) (noting a "staggeringly high" retention rate indicated the plan did not completely correct

15

unconstitutional aspects of the original plan). Merely invoking such criteria does not prevent the finding that the Commission racially gerrymandered. *See Miller*, 515 U.S. at 916.

In determining the weight of previous legislative enactments, the district court properly considered the "'historical background' of a legislative enactment [a]s 'one evidentiary source' relevant to the question of intent." Op.94-96; *Abbott,* 585 U.S. at 651 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977)); *see also Jacksonville Branch of NAACP v. City of Jacksonville*, 635 F.Supp.3d 1229, 1285 (M.D. Fla. 2022) ("*Jacksonville I*").

The intent of earlier Commissions is relevant to the extent that it "naturally give[s] rise to—or tend[s] to refute—inferences" regarding the Commission's purpose in 2021. *Abbott*, 585 U.S. at 607. The Commission's redistricting plans in the last four decades properly inform the Court's assessment of the Commission's intent in 2021. *See Jacksonville I*, 635 F.Supp.3d at 1286. This is particularly true where, as here, the Commission used the same map drawing process as in 2013, two of five commissioners were part of the passage of the 2013 plan, and one announced the Commission's intention to retain that plan to the highest degree possible. Op.42-48; Doc.178(p.19).

"Core preservation" does not shield this racial gerrymander from strict scrutiny. *See, e.g.*, *Chen v. City of Houston*, 206 F.3d 502, 518 (5th Cir. 2000)

("[E]vidence that impermissible racial intent had tainted the plan upon which the challenged plan was based has been allowed, even when enough time has elapsed for a substantial degree of familiarity and political reliance to emerge.") (citation omitted). If it did, a jurisdiction could "immunize from challenge a new racially discriminatory redistricting plan simply by claiming that it resembled an old racially discriminatory plan." *Allen v. Milligan*, 599 U.S. 1, 21-22 (2023). Moreover, a "core preservation" defense is "not directly relevant to the origin of the new district inhabitants." *ALBC*, 575 U.S. at 274. For example, a desire to retain the core of prior maps does not explain why the Commission's districts have continuously followed Black population growth beyond Birmingham into the northern suburbs, Op.108-109, creating "stark splits in the racial composition of populations moved into and out of disparate parts of [a] district," *Bethune-Hill*, 580 U.S. at 192.

Regardless, the district court found that Plaintiffs' illustrative plans demonstrate that the 2021 plan's district lines are inexplicable on grounds other than race, even when maximizing core retention. Op.58. Plaintiffs' illustrative plans showed plan-wide, and at the district and precinct level, that the 2021 plan is an outlier even among thousands of simulated plans that Appellant acknowledges prioritize core retention equally or more than the 2021 plan. Op.58-61; AppellantBr.14. Appellant attempted to rebut this evidence exclusively through the testimony of expert Michael Barber, whom the district court found not credible and whose own scholarship and

prior testimony support a conclusion that the 2021 plan is an outlier and a "significant deviation from a fair outcome." Op.55-57.

Appellant has not met its demanding burden of showing, in the face of this evidence, that the district court's findings are clearly erroneous under Rule 52.

## II.    The Equities Favor Plaintiffs.

### A. Plaintiffs, and the Public, will be Irreparably Harmed if the Commission is Permitted to Use Racially Gerrymandered Districts in the 2026 Election.

Appellant claims it will be irreparably harmed if it cannot enforce its "'duly enacted' redistricting plan." AppellantBr.-20. But a municipality is not harmed by an injunction barring it "from conducting . . . elections pursuant to a [duly-enacted redistricting] statute'" where "the [redistricting] statute is unconstitutional." *Abbott*, 585 U.S. at 602; *see also Jacksonville II*, 2022 WL 16754389, at \*4 ("Given that the district court found the Enacted Plan is . . . unconstitutional, we do not see how Appellants would be irreparably harmed by using a different map."). Appellant's "failure to show that the injunction would cause irreparable injury is an adequate and independent basis for denying the motion to stay pending appeal." *Ga. Muslim Voter Project v. Kemp*, 918 F.3d 1262, 1268 (11th Cir. 2019) (Pryor, J., concurring in the denial of the stay).

For similar reasons, "the public interest lies" in enjoining Appellant's unconstitutional plan. *Nken*, 556 U.S. at 426. "[T]he public, when the state is a party

asserting harm, has no interest in enforcing an unconstitutional law." *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010); *see also Jacksonville II*, 2022 WL 16754389, at *5. Instead, "the public interest is served when constitutional rights are protected." *DECF*, 915 F.3d at 1327. Over a year before the next elections, the public interest is served by preventing Appellant from using an unconstitutional districting plan. "[C]ompliance with federal law is [not] an onerous burden[.]" *Singleton*, 691 F.Supp.3d 1343, 1356 (N.D. Ala. 2023).

By contrast, Appellees will suffer irreparable harm if no remedial map is put into place for the 2026 election. "Numerous cases have described the immense harm caused by racial gerrymandering," which always "constitute[s] irreparable harm to" voters. *Jacksonville II*, 2022 WL 16754389, at *5 (citations omitted). The way to obviate that harm is to implement remedial maps through an orderly process well in advance of the next general election, because "'once the election occurs, there can be no do-over and no redress' for voters whose rights were violated." *Singleton*, 691 F.Supp.3d at 1355 (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)).

Appellant also claims it will suffer "severe" and "irreparable" harm if a remedial map is implemented because, in their words, "Black voters" will be placed into districts "on account of their race." AppellantBr.-20. But that's what the district court found *the Commission* to have done in the 2021 plan. Altering district lines to

remedy an unlawful racial gerrymander–based on a district court's well-reasoned and extensively supported judgment after trial–is what must be done to avoid that harm. This neither harms Appellant nor offends equal protection principles. *Cf. North Carolina v. Covington*, 585 U.S. 969, 978 (2018).

## B. Purcell Does Not Apply.

*Purcell* does not warrant a contrary conclusion.

Plaintiffs filed their complaint over three years before the 2026 elections. *See* Doc.1. The district court entered its permanent injunction after a full trial on the merits more than a year before the next Commission elections. Doc.191. This Court has recognized that four months before an election is the "outer bounds" of *Purcell's* applicability. *See Jacksonville II*, 2022 WL 16754389, at *1-2 (denying a stay request where, as here, the candidate filing deadline was three months away). No court has *ever* found *Purcell* to warrant a stay when an election is over a year away. *Allen*, 144 S. Ct. at 476 (denying request to stay injunction issued over a year before general election); *Va. House of Delegates v. Bethune-Hill*, 586 U.S. 112 (2019); *McCrory v. Harris*, 577 U.S. 1129 (2016) (denying stay nine months before election). And Appellant cannot avail itself of the *Purcell* principle with an eleventh-hour self-serving timeline. *See Rose,* 143 S. Ct. at 59.

With so much time remaining before election day, "the primary reason for applying th[e] [*Purcell*] standard—risk of voter confusion—[is] lacking."

20

*Jacksonville II*, 2022 WL 16754389, at \*3. Moreover, the injunction addresses a single county's redistricting plan where the *primary* election is eight months away. *Cf. Jacksonville II*, 2022 WL 16754389, at \*2 (requiring changes to districts in one county over five months before elections is not burdensome). Even assuming the (at most) inconveniences the Commission speculates occur, this does not require "heroic efforts" within a "few weeks" to avoid "chaos and confusion." *See Merrill v. Milligan,* 142 S. Ct. 879, 880 (2022) (Kavanaugh, J. concurring).

Because *Purcell* does not favor a stay, Appellant attempts to dramatically expand its scope, suggesting a rule that requires staying *any* injunction that affects districts until *all* appellate review has been exhausted. Doc.194(p.3). No precedent supports this expansive view of *Purcell*[1]—which would condemn plaintiffs to suffering irreparable harm in *every* redistricting case. If anything, granting a stay based on *Purcell* would undermine public confidence and cause confusion by forcing voters to cast ballots under districts a federal court declared unconstitutional. *See DECF*, 915 F.3d at 1327 (public knowledge of unfair voting practices "would be harmful to the public's perception of the election's legitimacy,"); Op.87n.32; *cf.*

---

[1] Appellant's sole authority for this contention—a single judge's concurrence in an out-of-circuit decision—concerned an injunction entered "*less than two weeks* before Texas's filing deadline." *Petteway v. Galveston Cnty.*, 87 F.4th 721, 724 (5th Cir. 2023) (Oldham, J., concurring).

*ALBC*, 575 U.S. at 283 (2015) (Scalia, J., dissenting) ("Racial gerrymandering . . . undermin[es] the electorate's confidence").

District courts have a "duty to cure illegally gerrymandered districts through an orderly process in advance of elections." *North Carolina v. Covington*, 585 U.S. 969, 977 (2018). This suit was filed when "there [was] no election on the immediate horizon." Doc.54(p.28). A year before an election is not the eve of an election. There is more than enough time to implement a remedy. The ordinary *Nken* factors govern.

The Commission's self-serving attempt to introduce a new deadline fails to alter the equities in its favor. *Cf. United States v. Stein,* 881 F.3d 853, 857 (11th Cir. 2018) (a "court can certainly take into account the self-serving nature of a litigant's testimony."). In August 2023, the Commission represented that one month before candidate qualifying was the "most conservative estimate" of the time needed "to redraw the districts, notify voters and candidates, and allow candidates sufficient time to qualify before the deadline." Doc.31(¶50) (Stephenson); *see also* Doc.205-n.1 (noting the Commission's recent statements "do[]not align with the Commission's earlier representation"). This assertion led to the conclusion a remedial map would need to be in place by December 23, 2025.[2] However, after Appellant lost at trial, it submitted a new deadline: October 20, 2025, Docs.194,194-

---

[2] State of Ala., Off. of the Sec'y of State, Elections Div., *Administrative Calendar 2026 Statewide Election* (May 6, 2025), https://www.sos.alabama.gov/sites/default/files/election-2026/Admin%20Calendar%20-2026.pdf.

1. AppellantBr.-22. This deadline went unmentioned during two years of proceedings, an extensive summary judgment hearing, multiple trial scheduling conferences, and trial. *See generally* Doc.156; Doc.174(648:7-730:18).

Courts prohibit such tactics "to protect the integrity of the judicial process." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted). Both this Court and the Supreme Court have rejected a party's attempt to invoke *Purcell* argument "in light of . . . previous representations to the district court that the schedule on which the district court proceeded was sufficient to enable effectual relief." *Jacksonville II*, 2022 WL 16754389, at *6 (11th Cir. Nov. 7, 2022) (quoting *Rose*, 143 S. Ct. at 59). Appellant fails to demonstrate entitlement to the extraordinary remedy it seeks, notwithstanding its eleventh-hour attempt to tip the equities in its favor.

## **<u>CONCLUSION</u>**

For the foregoing reasons, this Court should DENY Appellant's request for a stay.

Dated: October 3, 2025

Respectfully submitted,

*/s/ Kathryn Sadasivan*
Kathryn Sadasivan
Brenda Wright
NAACP Legal Defense and
Educational Fund, Inc

Nicki Lawsen
WIGGINS CHILDS PANTAZIS
FISHER & GOLDFARB, LLC
301 19th Street North
Birmingham, AL 35203

40 Rector Street, 5th Floor
New York, NY 10006
Tel: (212) 965-2200
Fax: (212) 226-7592
ksadasivan@naacpldf.org
bwright@naacpldf.org

Kacey Mordecai
NAACP Legal Defense and
Educational Fund, Inc
700 14th Street N.W., Ste. 600
Washington, DC 20005
Tel: (202) 682-1300
kmordecai@naacpldf.org

Daniel Hessel
Samuel Davis
Election Law Clinic
Harvard Law School
6 Everett Street, Suite 4105
Cambridge, MA 02138
Tel: (917) 403-4976
dhessel@law.harvard.edu
sadavis@law.harvard.edu

Phone: (205) 341-0498
Fax: (205) 254-1500
nlawsen@wigginchilds.com
Nicki Lawsen (ASB-2602-C00K)
WIGGINS CHILDS PANTAZIS
FISHER & GOLDFARB, LLC
301 19th Street North
Birmingham, AL 35203
Phone: (205) 341-0498
Fax: (205) 254-1500
nlawsen@wigginchilds.com

*Counsel for Appellees*

**CERTIFICATE OF COMPLIANCE**

This brief complies with Rule 27(d)(2)(A) because it contains 5,165 words,

excluding the parts that can be excluded. This brief also complies with Rule

32(a)(5)-(6) because it is prepared in a proportionally spaced face using

Microsoft® Word for Microsoft 365 MSO (Version 2508 Build 16.0.19127.20192)

64-bit in 14-point Times New Roman font.

*/s/ Kathryn Sadasivan*
Kathryn Sadasivan

**CERTIFICATE OF SERVICE**

I hereby certify that on October 3, 2025, I electronically filed the foregoing

with the Clerk of Court for the United States Court of Appeals for the Eleventh

Circuit using the CM/ECF system thereby serving all counsel of record.

*/s/ Kathryn Sadasivan*
Kathryn Sadasivan