No. 25-13253
(*consolidated with No. 25-13254*)

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

CARA MCCLURE, ET AL.,

*Plaintiffs-Appellees*,

v.

JEFFERSON COUNTY COMMISSION,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Northern District of Alabama, No. 2:23-cv-00443 (Haikala, J.)

## OPENING BRIEF OF DEFENDANT-APPELLANT

Theodore A. Lawson, II
JEFFERSON COUNTY ATTORNEY'S OFFICE
716 Richard Arrington Jr. Blvd. North
Room 280
Birmingham, AL 35203
(205) 325-5688
lawsont@jccal.org

Michael Taunton
BALCH & BINGHAM LLP
1901 Sixth Ave. N. Suite 1500
Birmingham, AL 35203
(205) 226-3451
mtaunton@balch.com

Taylor A.R. Meehan
Rachael C.T. Wyrick
Marie E. Sayer
Soren Geiger
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
taylor@consovoymccarthy.com
rachael@consovoymccarthy.com
mari@consovoymccarthy.com
soren@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
(703) 243-9423
patrick@consovoymccarthy.com

November 10, 2025

*Counsel for Appellant*

No. 25-13254
(*consolidated with No. 25-13253*)

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ALEXIA ADDOH-KONDI, ET AL.,

*Plaintiffs-Appellees*,

v.

JEFFERSON COUNTY COMMISSION,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Northern District of Alabama, No. 2:23-cv-00503 (Haikala, J.)

## OPENING BRIEF OF DEFENDANT-APPELLANT

Theodore A. Lawson, II
JEFFERSON COUNTY ATTORNEY'S OFFICE
716 Richard Arrington Jr. Blvd. North
Room 280
Birmingham, AL 35203
(205) 325-5688
lawsont@jccal.org

Michael Taunton
BALCH & BINGHAM LLP
1901 Sixth Ave. N. Suite 1500
Birmingham, AL 35203
(205) 226-3451
mtaunton@balch.com

Taylor A.R. Meehan
Rachael C.T. Wyrick
Marie E. Sayer
Soren Geiger
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
taylor@consovoymccarthy.com
rachael@consovoymccarthy.com
mari@consovoymccarthy.com
soren@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
(703) 243-9423
patrick@consovoymccarthy.com

November 10, 2025

*Counsel for Appellant*

*McClure v. Jefferson County Commission*, No. 25-13253
*Addoh-Kondi v. Jefferson County Commission*, No.25-13254

## CERTIFICATE OF INTERESTED PERSONS

Per Rule 26.1 and Eleventh Circuit Rule 26.1, the undersigned certifies that the following may have an interest in the outcome of this appeal:

1. Addoh-Kondi, Alexia, *Addoh-Kondi Plaintiff-Appellee*

2. Alabama State Conference of the NAACP, *McClure Plaintiff-Appellee*

3. Bernstein, C'Zar, *Former Counsel for Defendant-Appellant*

4. Blacksher, James, *Counsel for Addoh-Kondi Plaintiffs-Appellees*

5. Bonner, Cynthia, *Addoh-Kondi Plaintiff-Appellee*

6. Brown, Ja'Nelle, *Addoh-Kondi Plaintiff-Appellee*

7. Carter, Brittany, *Counsel for McClure Plaintiffs-Appellees*

8. Carroll, Donald, *Counsel for Defendant-Appellant*

9. Clemon, U.W., *Counsel for Addoh-Kondi Plaintiffs-Appellees*

10. Geiger, Soren, *Counsel for Defendant-Appellant*

11. Greater Birmingham Ministries, *McClure Plaintiff-Appellee*

12. Grisafi, Lily, *Counsel for McClure Plaintiffs-Appellees*

13. Haikala, Madeline, *United States District Judge (N.D. Ala.)*

14. Hall, Eric, *Addoh-Kondi Plaintiff-Appellee*

15. Hansen, Michael, *Addoh-Kondi Plaintiff-Appellee*

16. Hessel, Daniel, *Former Counsel for McClure Plaintiffs-Appellees*

17. Juarez, Julia, *Addoh-Kondi Plaintiff-Appellee*

18. Lane, Kathleen, *Former Counsel for Defendant-Appellant*

*McClure v. Jefferson County Commission*, No. 25-13253
*Addoh-Kondi v. Jefferson County Commission*, No.25-13254

19. Lawsen, Nicki, *Counsel for McClure Plaintiffs-Appellees*

20. Lawson, II, Theodore, *Counsel for Defendant-Appellant*

21. Long, Charles, *Addoh-Kondi Plaintiff-Appellee*

22. McClure, Cara, *McClure Plaintiff-Appellee*

23. Meehan, Taylor, *Counsel for Defendant-Appellant*

24. Metro-Birmingham Branch of the NAACP, *McClure Plaintiff-Appellee*

25. Mordecai, Kacey-Ann, *Counsel for McClure Plaintiffs-Appellees*

26. Muhammad, William, *Addoh-Kondi Plaintiff-Appellee*

27. Randall, Fred, *Addoh-Kondi Plaintiff-Appellee*

28. Rice, Richard, *Counsel for Addoh-Kondi Plaintiffs-Appellees*

29. Ross, Deuel, *Counsel for McClure Plaintiffs-Appellees*

30. Rouco, Richard, *Counsel for Addoh-Kondi Plaintiffs-Appellees*

31. Sadasivan, Kathryn, *Counsel for McClure Plaintiffs-Appellees*

32. Sayer, Marie, *Counsel for Defendant-Appellant*

33. Sheikh, Uruj, *Counsel for McClure Plaintiffs-Appellees*

34. Smith, Tammie, *Addoh-Kondi Plaintiff-Appellee*

35. Strawbridge, Patrick, *Counsel for Defendant-Appellant*

36. Taunton, Michael, *Counsel for Defendant-Appellant*

37. Walker, Dorman, *Former Counsel for Defendant-Appellant*

38. Walker, Robert, *Addoh-Kondi Plaintiff-Appellee*

*McClure v. Jefferson County Commission*, No. 25-13253
*Addoh-Kondi v. Jefferson County Commission*, No.25-13254

39. Wright, Brenda, *Counsel for McClure Plaintiffs-Appellees*

40. Wyrick, Rachael, *Counsel for Defendant-Appellant*

Dated: November 10, 2025                    /s/ *Taylor A.R. Meehan*

C-3 of 3

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument. The district court invalidated each of Jefferson County's five commission districts as racially gerrymandered. The court relegated its application of *Alexander v. South Carolina NAACP*, 602 U.S. 1 (2024), to a footnote. In place of *Alexander*, the court held that the county's decades-old compliance with §5 of the Voting Rights Act transforms non-racial redistricting goals like core retention into racial ones. Given these important constitutional issues, oral argument is warranted.

**TABLE OF CONTENTS**

Certificate of Interested Persons ...................................................................... C-1

Statement Regarding Oral Argument ....................................................................i

Table of Authorities ........................................................................................ iv

Introduction .....................................................................................................1

Jurisdictional Statement ....................................................................................2

Statement of the Issues .....................................................................................2

Statement of the Case .......................................................................................2

    I.     Past redistricting plans ...........................................................................2

    II.    The 2021 redistricting process ................................................................4

    III.   The Enacted Plan ..................................................................................8

    IV.  Plaintiffs' racial gerrymandering allegations and trial .............................. 10

        A.    District 1 changes ...................................................................... 11

        B.    District 2 changes ...................................................................... 14

        C.    District 3 changes ...................................................................... 17

        D.    District 4 changes ...................................................................... 17

        E.    District 5 changes ...................................................................... 18

        F.    Plaintiffs' "illustrative" plans ..................................................... 18

        G.   Simulation analyses ................................................................... 19

        H.   Regression analyses ................................................................... 20

    V.    The district court's decision ................................................................. 21

Standard of Review ........................................................................................ 23

Summary of Argument ................................................................................... 24

Argument ...................................................................................................... 25

    I.     The disregard for *Alexander* is reversible error ................................... 27

        A.    *Alexander* dictates the ground rules for this case ................................ 27

        B.    Plaintiffs did not rule out non-racial explanations
              for the Enacted Plan .................................................................. 29

             1.    Non-racial political explanations,
                    including core preservation ........................................... 29

2.    Non-racial municipal explanations ............................................. 32

3.    These and other non-racial explanations
      are not "post hoc speculation" ................................................... 35

C.    Plaintiffs did not prove race predominated in any district ................. 36

1.    District 1 ...................................................................................... 36

2.    District 2 ...................................................................................... 41

3.    Districts 3, 4, and 5 ..................................................................... 45

II.    Past §5 compliance is not evidence of present-day racial gerrymandering .. 47

A.    The §5 correspondence contains no evidence of racial targets
      in past redistricting .................................................................... 48

B.    Past redistricting efforts cannot be imputed to the present-day
      Commission ............................................................................... 51

Conclusion ........................................................................................................ 53

Certificate of Compliance ................................................................................. 55

Certificate of Service ......................................................................................... 55

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez,*
  585 U.S. 579 (2018) ........................................................... 23, 25, 52, 53

*Agee v. Benson,*
  2023 WL 8826692 (W.D. Mich. Dec. 21, 2023) ........................................ 34

*Ala. Legis. Black Caucus v. Alabama,*
  575 U.S. 254 (2015) ........................................ 20, 23, 29, 32, 36, 45

*Alexander v. South Carolina NAACP,*
  602 U.S. 1 (2024) .............1, 2, 4, 20, 24, 25, 26, 27, 29, 30, 32, 34, 37, 40, 41, 43, 46

*Allen v. Milligan,*
  599 U.S. 1 (2023) ........................................................................... 44

*Bethune-Hill v. Va. State Bd. of Elections,*
  580 U.S. 178 (2017) ...........................................23, 28, 35, 38, 50

*Brnovich v. DNC,*
  594 U.S. 647 (2021) ........................................................................... 45

*Chen v. City of Houston,*
  206 F.3d 502 (5th Cir. 2000) ........................................................... 51

*Christian Ministerial All. v. Jester,*
  786 F. Supp. 3d 1134 (E.D. Ark. 2025) ........................................... 30

*Clark v. Putnam County,*
  293 F.3d 1261 (11th Cir. 2002) ....................................................... 50

*Clark v. Roemer,*
  500 U.S. 646 (1991) ..................................................................... 3, 50

*Cooper v. Harris,*
  581 U.S. 285 (2017) ....................................................................... 50

*Easley v. Cromartie,*
  532 U.S. 234 (2001) (*Cromartie II*)...........................25, 26, 35, 38, 43, 45, 46

*Ellard v. Ala. Bd. of Pardons & Paroles,*
  928 F.2d 378 (11th Cir. 1991).......................................................33, 40, 41

*Greater Birmingham Ministries v. Sec'y of State for Ala.,*
  992 F.3d 1299 (11th Cir. 2021).......................................................... 51

*Hunt v. Cromartie,*
  526 U.S. 541 (1999) (*Cromartie I*) .....................................................1

*Johnson v. Governor of Fla.*,
  405 F.3d 1214 (11th Cir. 2005)......................................................... 52

*Karcher v. Daggett*,
  462 U.S. 725 (1983) ......................................................................... 30

*Klay v. United Health Grp.*,
  376 F.3d 1092 (11th Cir. 2004)......................................................... 23

*LWV of Fla. v. Fla. Sec'y of State*,
  66 F.4th 905 (11th Cir. 2023)........................................................... 51

*LWV of Fla. v. Fla. Sec'y of State*,
  32 F.4th 1363 (11th Cir. 2022) ......................................................... 45

*M.H. by & through Lynah v. Comm'r of the Ga. Dep't of Cmty. Health*,
  111 F.4th 1301 (11th Cir. 2024) ....................................................... 23

*\*Miller v. Johnson*,
  515 U.S. 900 (1995) ...............................................1, 25, 26, 37, 44, 46, 49, 50

*Pers. Adm'r of Mass. v. Feeney*,
  442 U.S. 256 (1979) ......................................................................... 34

*S.C. NAACP v. Alexander*,
  649 F. Supp. 3d 177 (D.S.C. 2023) .................................................. 28

*Shaw v. Hunt*,
  517 U.S. 899 (1996) ......................................................................... 25

*Shelby County v. Holder*,
  570 U.S. 529 (2013) ..................................................................... 4, 50

*Thornburg v. Gingles*,
  478 U.S. 30 (1986) ......................................................................23, 28

*United States v. Baker*,
  432 F.3d 1189 (11th Cir. 2005)......................................................... 45

*United States v. Newman*,
  614 F.3d 1232 (11th Cir. 2010).....................................................24, 48

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ......................................................................... 26

*Yeldell v. Cooper Green Hosp., Inc.*,
  956 F.2d 1056 (11th Cir. 1992)...........................................................3

## Statutes

28 U.S.C. §1292...................................................................................2

28 U.S.C. §1331................................................................................................................2

Ala. Code §6-8-60............................................................................................................6

**Other Authorities**

*General Election Results 2022 Summary Report,* Jefferson County Probate Court,
    https://perma.cc/6V7Y-AQXR.....................................................................................5

*Jurisdictions Previously Covered by Section 5*, U.S. Dep't of Just. C.R. Div. (last visited Nov.
    7, 2025) https://perma.cc/HFP2-BK47 .................................................................. 28

**INTRODUCTION**

A racial gerrymandering claim requires proof that "race was the predominant factor motivating" redistricting, *Miller v. Johnson*, 515 U.S. 900, 916 (1995), meaning districts are "unexplainable on grounds other than race," *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (*Cromartie I*). The Supreme Court's decision in *Alexander v. South Carolina NAACP* is clear: Plaintiffs bear an "especially stringent" burden. 602 U.S. 1, 11 (2024). They must overcome the presumption of legislative good faith and "disentangle" non-racial explanations for district lines, including "core preservation," from racial ones. *Id.* at 7, 9-10.

The district court did not hold Plaintiffs to that burden before enjoining the use of all five districts for the Jefferson County Commission. The district court deemed *Alexander* inapplicable. That was reversible error. According to the district court, the county's "history" of §5 compliance made this a different case than *Alexander*. But South Carolina, too, was subject to §5 in decades past. And still the Supreme Court required plaintiffs there to rule out non-racial explanations for the present redistricting cycle. *Id.* at 7. The district court's contrary approach would call into question the constitutionality of districts across the American south simply because they were subject to §5 preclearance in decades past.

There should be no dispute that, applying *Alexander*, Plaintiffs fell well short of their burden. After years of litigation and a four-day bench trial, they offered no proof that "race was the criterion that … could not be compromised in the drawing of district

1

lines" when the county redistricted in 2021. *Id.* (cleaned up). Little different than *Alexander*, Plaintiffs proved only racial "side effect[s]" of undisputed non-racial redistricting priorities, *id.* at 20—namely, keeping districts mostly the same to protect the county's five incumbent commissioners, as well as other political considerations, municipality considerations, and elections administration concerns. Indeed, there was no mention of race at all before the 2021 Enacted Plan was adopted. This Court must reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §1331 because Plaintiffs' claims arise under the Constitution. This Court has jurisdiction under 28 U.S.C. §1292(a) because the Commission appeals from an order granting an injunction. The district court entered that order on September 16, 2025, DE191, and the Commission timely appealed on September 18, 2025, DE193.

## STATEMENT OF THE ISSUES

1. Did the district court abuse its discretion by disregarding *Alexander v. South Carolina NAACP*, 602 U.S. 1 (2024)?

2. Did the district court abuse its discretion by equating past compliance with §5 of the Voting Rights Act with present-day racial gerrymandering?

## STATEMENT OF THE CASE

### I.    Past redistricting plans

In 1985, Jefferson County, Alabama entered into a consent decree to resolve Voting Rights Act litigation. The decree altered the Commission "from a three-member

2

at-large elected commission to a five-member district form of government to ensure greater minority representation on the Commission." *Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056, 1058 (11th Cir. 1992). The consent decree imposed no "explicit racial targets" for those districts. Op.14. The 1985 map anchored Districts 1 and 2 in Birmingham. DE172 261:1-6, DE169-111 at 4.[1] Districts tracked municipal boundaries, natural features, major roads, and railroad lines. DE176-3; DE173 312:20-314:7.

Section 5 of the Voting Rights Act required the county to pre-clear districting changes with the U.S. Attorney General to ensure changes would not dilute or abridge voting rights. *See Clark v. Roemer*, 500 U.S. 646, 658 (1991). The county submitted the consent decree's districts to the Department of Justice. The 1985 correspondence described the "anticipated effect of the change" as creating five single-member districts, including two majority-minority districts (Districts 1 and 2) and recounted the resulting racial demographics for DOJ's approval. DE169-2 at 3. DOJ approved the plan.

The Commission redistricted in 1993, 2001, and 2013. And DOJ approved every plan. DE169-3 at 135; DE169-6 at 103; DE169-111 at 2. Over the decades, districts retained the same basic geography, with Districts 1 and 2 anchored in Birmingham and expanding outward to equalize population. DE173 311:17-19. The §5 correspondence to DOJ in 1993, 2001, and 2013 identified the resulting racial demographics when

---

[1] All appendix citations are labeled "DE" and correspond to docket entries in *McClure v. Jefferson County Commission*, No. 2:23-cv-443. Page numbers in record citations reflect the blue ECF pagination. 11th Cir. R. 28-5. Transcript citations (DE172, DE173, DE174, DE175, DE179-5, DE179-8) use internal pagination.

addressing the "anticipated effect" of the boundary changes. DE169-3 at 3; DE169-6 at 10-11; DE169-111 at 9. Districts 1 and 2 remained majority-Black districts—a non-racial "side effect" of anchoring those districts in the county's largest city of Birmingham, *Alexander*, 602 U.S. at 20—while the particular racial demographics of all districts fluctuated over the decades. *See* DE169-2 at 19-23; DE169-33 at 110; DE169-6 at 11, 44-45; DE169-111 at 9; DE179-16 at 10, 22, 31, 34, 37; DE169-108 at 105, 107. The county's §5 correspondence never expressed any intent to redistrict based on any racial target. For instance, in 2001, the only reference to what was "intended" was the intent to equalize population. DE169-6 at 10; *accord* DE169-111 at 8 (similar for 2013). In 2013, the VRA was not even discussed during redistricting. DE174 726:17-21. The county simply confirmed afterward that districts continued to comply with the VRA in a letter to DOJ, as required before *Shelby County v. Holder*, 570 U.S. 529 (2013). DE174 711:7-15; DE169-111 at 8.

## II.  The 2021 redistricting process

Following the 2020 census, the Commission redistricted. At the time, the Commissioners were Lashunda Scales (District 1), Sheila Tyson (District 2), Jimmie Stephens (District 3), Joe Knight (District 4), and Steve Ammons (District 5). Op.5.[2] Commissioners Scales and Tyson are Democrats, while Stephens, Knight, and Ammons are

---

[2] The district court erroneously named Commissioner Knight as president pro tempore; Commissioner Scales held that position during redistricting. *See* DE179-7 at 1.

Republicans, and all five were running for reelection in 2022. *General Election Results 2022 Summary Report,* Jefferson County Probate Court, https://perma.cc/6V7Y-AQXR.

The census showed population had shifted away from central Jefferson County (where Districts 1 and 2 are located) and into the surrounding areas (where Districts 3, 4, and 5 are located). DE179-3 at 5. Any redistricting plan would therefore have to add population to Districts 1 and 2 from Districts 3, 4, and 5. *Id.* at 6.

In October 2021, the Commission held a public work session to discuss the redistricting process. Op.42; DE174 655:17-22, 700:11-14. The county livestreamed the meeting on its website. *Id.* Barry Stephenson, the Chairman of the Jefferson County Board of Registrars, described the redistricting process and three proposed plans. DE179-3. Mr. Stephenson explained how the Commissioners started with the existing districts and moved only a handful of areas in the proposed plans. Op.41-42; DE179-5 33:24-34:3. Mr. Stephenson also explained how every proposed plan equalized population within +/- 1% of the ideal district population. Op.41; DE179-5 33:11-12. Proposed changes to Districts 3, 4, and 5 were the same in all three proposals. Op.42; DE179-5 35:22-36:17. The only difference between proposals concerned the placement of three precincts along the border of Districts 1 and 2. *Id.*

In November 2021, the Commission held a public hearing for county residents to comment and the Commissioners to vote on the proposals. Op.43; DE179-8. The Commission published legal notice of the hearing in a newspaper for more than two

weeks and noted that the map could be viewed at the Board of Registrars.[3] DE169-15; DE169-16; Ala. Code §6-8-60(b). Several residents came to the Board of Registrars to view the maps and ask questions. DE174 663:13-23. The Commission also promoted the public hearing on Twitter and included the date and time in the resolution posted on the county's website. Op.45; DE169-15. The hearing was also livestreamed on the county's website. Op.45; DE174 665:18-22.

During the hearing, Commissioners expressed their desire to keep their existing constituents and retain the cores of their districts. Commissioner Stephens said that "no one really likes to change" and he had "to go now tell some of my good constituents that—that I will no longer represent them." DE179-8 35:21-36:13. Commissioner Knight explained that "we don't want to really give up people, but we have to to make it balanced and even." *Id.* 45:8-10. Commissioner Tyson, whose district was underpopulated, described the process the same way: "you hold what you got and you pull from the people that's overpopulated." *Id.* 39:16-18. Likewise, several members of the public spoke about how they would like to keep their existing Commissioner. DE179-8 22:4-6, 16-18; 31:4-6. No one raised any concern that the proposed plans were racial gerrymanders. Op.45. By a 4-1 vote, the Commission adopted the proposal that made the fewest changes to the existing districts. Op.46; DE179-3 14-16; DE179-8 35:4-20.

---

[3] The district court clearly erred in finding that notice was given in only the *Alabama Messenger*. Op.43. There was uncontroverted evidence that the notice was also published in the *Birmingham News* for sixteen days, and the resolution announcing the meeting was available on the county's website. DE169-15; DE169-16.

Only District 1's Commissioner Scales voted against the plan. *Id.* During the hearing, she said all plans were "good for Scales," DE179-8 38:9, specifying she was "tak[ing] in Center Point which is highly Democratic" and "Dolomite which is highly Democratic," DE179-8 33:1-3. But she criticized areas added to Commissioner Tyson's District 2 as "Republican." DE179-8 31:17-22. She told the public to "ask yourself concerning Homewood, Ross Bridge, Lake Shore, is that a heavily populated Democratic area?" DE179-8 33:1-5.

After the vote, Commissioner Tyson responded to Commissioner Scales's criticism: "Now, I've sat here [and] not said anything … but I want the public to know this …. [I]f you think I will draw myself into my demise you got to be crazy." DE179-8 39:12-22. She then described the political affiliation of particular areas added to her district as well as the racial demographics of a subset of those areas. She described the addition of Rosedale as "a 99.2 percent Black community" and "all Democrats." DE179-8 39:18-20. She described adding "the other Democratic part of Homewood." DE179-8 39:24. She described adding "the Mountain View part" of the Ross Bridge precinct, which she said "is 89 percent Democratic and black." DE179-8 40:5-12. Similarly, she said she added Bessemer areas that were "99 percent Democratic, 99 percent Black," and she "looked at the folks in the[] face." DE179-8 40:17-23. These statements were all in response to Commissioner Scales's criticism that the Enacted Plan pulled overly Republican areas into District 2. As for District 2's racial demographics, there is no dispute that the Enacted Plan adds more white residents than Black residents to

7

District 2 and that District 2 was the only district of all five to *decline* in BVAP. DE179-19; DE179:16 at 22.

### III.    The Enacted Plan

Every district in the Enacted Plan retains 90% or more of the district's existing constituents, consistent with Commissioners' stated goal of keeping districts mostly the same. Op.47. Shown below, the Enacted Plan moves only 13 of the county's more than 160 precincts:



DE179-2. All experts agreed that the plan could be described as a "least changes" plan with high core retention. DE172 80:17-24, 178:23-179:1; DE173 329:1-9, 417:15-18;

DE174 540:8-14; DE175 754:24-25. The overall core retention of the Enacted Plan is 95.3%, meaning the Enacted Plan keeps more than 640,000 of the county's roughly 675,000 residents in their existing districts. Op.54; DE169-26 at 14.

As for the small changes required to re-populate Districts 1 and 2, the Enacted Plan simply adds additional municipal neighborhoods from municipalities already districted in Districts 1 and 2. Consistent with the long-time decision to place Birmingham in Districts 1 and 2, those districts now contain nearly 95% of Birmingham's residents. DE175 758:23-759:2.[4] Every precinct added to District 1 contained Birmingham neighborhoods. DE175 767:4-8. Every precinct added to District 2 contained Birmingham, Bessemer, and Homewood neighborhoods—all municipalities in District 2 already. DE169-108 at 18, 24.

As for the plan's resulting racial demographics, the concentration of Black voters in districts changed only slightly when comparing districts just before and just after redistricting:

---

[4] The small fractions of Birmingham contained in Districts 3, 4, and 5 are outlying municipal annexations. Op.46. For example, the City of Birmingham annexed a retail area, the Summit, at the outer edge of the county that is otherwise surrounded by the city of Vestavia Hills. *Id.*

| | 2010 BVAP (2013 Plan) | 2020 BVAP (pre-redistricting) | +/- 2021 Ideal Pop. (pre-redistricting) | 2021 BVAP (Enacted Plan) |
|---|---|---|---|---|
| District 1 | 73.2% | 76.4% | -9.1% (-12,269) | 76.3% |
| District 2 | 71.3% | 66.7% | -10.1% (-13,572) | 64.1% |
| District 3 | 21.7% | 28.6% | +5.8% (+7,855) | 25.8% |
| District 4 | 22.4% | 29.5% | +5.3% (+7,108) | 25.7% |
| District 5 | 11.0% | 14.1% | +8.0% (+10,879) | 14.0% |

DE179-16 at 10, 22, 31, 34-35, 37.

## IV.    Plaintiffs' racial gerrymandering allegations and trial

Seventeen months after the Commission adopted the Enacted Plan and several months after the 2022 elections, two sets of Plaintiffs sued, claiming districts were racially gerrymandered. After the Supreme Court decided *Alexander*, the Commission moved for summary judgment, arguing Plaintiffs had not marshaled the evidence *Alexander* requires. DE94. Plaintiffs filed cross motions for summary judgment. DE96, DE101 (2:23-cv-503). The district court denied summary judgment, finding "the parties' expert opinions are at odds," and held a four-day bench trial in January 2025. DE164 at 61.

At trial, various fact and expert witnesses testified. In addition to testimony from some Plaintiffs, the McClure Plaintiffs relied on expert testimony from Bill Cooper, who analyzed the demographics of the Enacted Plan and offered "illustrative" plans; Baodong Liu, whose testimony mostly pertained to §2 concepts such as racially polarized voting; and Cory McCartan, who examined computer-simulated redistricting plans.

Op.6-7. The Addoh-Kondi Plaintiffs relied on expert testimony from Anthony Fairfax, who analyzed the demographics of the Enacted Plan and likewise offered an "illustrative" plan. Op.6. The Commission called Mr. Stephenson, who facilitated redistricting, and Dr. Michael Barber, who examined changes made to the Enacted Plan, thousands of computer-simulated redistricting plans, and Plaintiffs' "illustrative" plans. Op.6-7; DE170-16; DE170-17.

At trial, the Commission elicited testimony regarding each change made in the Enacted Plan, showing the absence of evidence of racial predominance as follows:

### A.    District 1 changes

 The Enacted Plan moved four precincts or portions of precincts into District 1, which was underpopulated by about 12,000 people. Op.41, 62.[5] All four precincts were adjacent to District 1 in the 2013 Plan. Op.62. Noted above, the simplest way to understand the changes made to District 1 is that every precinct chosen contained Birmingham neighborhoods. Op.62.

On the northeast side of District 1, Center Point Senior Center (Precinct 1125) and a portion of the Center Point Community Center (Precinct 1065) moved from

---

[5] The Enacted Plan removed the Brookside Community Center (Precinct 3280), with fewer than 100 people, from District 1 to District 3 after the Board of Registrars received complaints about the distance to the existing precinct. Op.61; DE179-16 at 12.

District 4 into District 1. DE179-2; DE174 673:4-10.[6] Both precincts contained Birmingham neighborhoods. DE179-16 at 17; DE175 773:13-20. Indeed, nearly 70% of Precinct 1065's population were Birmingham residents. DE179-16 at 16-18.[7] Those Birmingham residents were Commissioner Scales's former constituents when she represented that same area on the Birmingham City Council, shown in purple below:



[6] The district court used the Census Bureau's voter tabulation districts (VTDs) to describe changes to the Enacted Plan, which Plaintiffs' experts also used. The Commission redistricts based on precinct lines, not VTDs. DE174 672:21-22. Though VTD lines "match[] up pretty much exactly" with the county's precinct lines, there are slight differences in populations and there are naming differences. DE172 17:13-25; *see, e.g.*, Op.61 n.30 (recounting differences in populations reported by the parties' experts). For instance, the district court called Precinct 1065 (Center Point Community Center) the "East Pinson Valley Precinct." Op.64. While the Census has designated an "East Pinson Valley" VTD, there is no such county precinct. For accuracy, and consistent with the lines used in redistricting, the Commission uses precinct lines here.

[7] The Center Point Community Center Precinct is a split precinct, with Precinct 1065 in District 1 and Precinct 4060 in District 2. Adding the entire 8,000-person precinct to District 1 would have split the municipality of Pinson between Districts 1 and 4, even though no part of Pinson has ever been districted in District 1, and it would have exceeded the Commission's +/-1% population deviation goal. DE179-16 at 16-18 DE172 134:4-7; *see also* DE179-3 at 7.

DE179-22; *see* DE174 670:18-671:4. The remaining portions of Precincts 1125 and 1065 contained Center Point neighborhoods, adding to parts of Center Point included in District 1 in the 2013 map and which Commissioner Scales described as "highly Democratic." DE169-108 at 16 (2013 map showing municipalities); DE179-8 33:1-3. While the racial demographics of both precincts were majority Black—77.4% and 83.6% respectively, DE179-16 at 16—it was undisputed that there are nearby majority-Black census blocks that remained in District 4. DE179-16 at 17.

On the west side of District 1, a portion of the Dolomite West Field City Community Center (Precinct 1365) and the Minor Fire Station (Precinct 1285) moved from District 3 into District 1. Adding both precincts added additional Birmingham neighborhoods to District 1, leaving non-Birmingham municipalities in District 3. DE169-108 at 238; DE172 143:7-10. Shown below, the split Dolomite precinct followed Birmingham municipal lines, not racial lines:



13

DE169-108 at 238. And while the BVAP of that Birmingham area exceeded 80%, the BVAP of the non-Birmingham area remaining in District 3 was nearly 70%. DE179-16 at 15. As for Precinct 1285, Commissioner Scales attends church at Faith Chapel located in the adjacent Precinct 1160. DE174 671:24-672:5. Moreover, the BVAP of Precinct 1285 is 50.8%, which worked to *decrease* District 1's overall BVAP. DE179-16 at 15; DE175 774:20-25.

## B.    District 2 changes

The Enacted Plan moved six precincts or portions of precincts into District 2, which was underpopulated by about 13,500 people. DE179-3 at 6-7. All were adjacent to the existing District 2. DE179-16 at 23. And all added to the Birmingham, Bessemer, and Homewood municipalities already included in District 2. DE169-108 at 16, 22. While redistricting changes resulted in an increased BVAP in every other district, District 2's BVAP *decreased.* DE179-16 at 22. The Enacted Plan moved more white residents than Black residents into District 2. DE179-19. Because of this, Plaintiffs' expert, Mr. Fairfax, testified that it "is hard to say conclusively" that race predominated in District 2 given "white population increased more than black population." DE172 84:1-5.

Along the southeast border of District 2, a portion of the Oxmoor Valley Community Center (Precinct 2350), Homewood Community Center (Precincts 2095), and the Afton Lee Community Center (Precinct 2450) moved from District 5 into District 2. DE179-16 at 27; *see* DE174 694:25-695:19; 696:10-19. All three precincts added more Homewood neighborhoods to District 2. DE169-108 at 18, 24. With respect to Precinct

14

2350 specifically, that change reunited the Oxmoor Valley Community Center Precinct, previously split between Districts 2 and 5 in the 2013 plan. DE174 695:9-19. It is undisputed that uniting a split precinct is a non-racial explanation and improves elections administration. DE172 95:2-6; DE175 784:17-785:5.[8] Precincts 2095 and the moved portion of 2350 are overwhelmingly white, with BVAPs of only 13.9% and 27.5% respectively. DE179-16 at 27. Precinct 2450, with only 335 people, has a BVAP of 59.2%, less than District 2's existing BVAP and thus decreasing District 2's BVAP in the Enacted Plan. *Id.* at 22, 27.

Also along the southern border of District 2, a portion of the Ross Bridge Welcome Center (Precinct 2365) moved from District 3 to District 2. DE179-16 at 24. Shown below, it was undisputed that the split precinct follows "closely along municipal lines," adding more of Birmingham to District 2 and leaving Hoover and other areas in District 3. DE175 786:21-23; DE172 157:22-25, DE169-108 at 236. The new boundary also follows Shannon Road, a "major road through the Oxmoor Valley." DE174 693:24-694:11.

---

[8] The district court refused to account for that non-racial explanation because of "testimony that the commissioners did not focus on *municipal splits*" given frequent municipal annexations, Op.137 n.49 (emphasis added), erroneously conflating municipal splits with precinct splits.

15



DE169-108 at 236. Precinct 2365 has a BVAP of 50.6%, less than District 2's existing

BVAP and thus decreasing District 2's BVAP in the Enacted Plan. DE179-16 at 22, 24.

In the southwest corner of District 2, a portion of the Bessemer Civic Center

(Precinct 2245) and Grant Street Baptist Church (Precinct 2215) moved from District

3 to District 1. DE179-2; DE179-16 at 24; DE174 691:3-7, 692:21-25.[9] Both precincts

added more of Bessemer to District 2, which has been in District 2 since 1985. DE176-

3 at 4.[10] District 2's Commissioner Tyson, who narrowly won her 2018 primary in a

---

[9] The Bessemer Civic Center Precinct is one of the county's largest both by population, with over 8,500 people, and geographic size. DE174 691:9-11, DE179-16 at 25 & n.20. Roughly 6,000 residents from that precinct remain in District 3, with a BVAP of 68.6%. DE179-16 at 25; DE169-108 at 239. The smaller portion moved into District 2 is "heavily residential," while the portion remaining in District 3 gets "more rural pretty quickly" as one moves "south on Bessemer Super Highway." DE174 692:15-17.

[10] Commissioner Stephens (District 3) lives in South Bessemer, so adding all of Bessemer to District 2 would have drawn him out of his district. DE174 725:21-23.

run-off election against the former incumbent, "outperformed" in the Bessemer area. DE174 689:18-20. Precinct 2245 is a 79.4% BVAP precinct, but it is undisputed that the whole Bessemer Civic Center Precinct, including the portion remaining in District 3, is predominantly Black with predominantly Black census blocks remaining in District 3. DE172 106:11-25, 110:17-111:7; DE179-16 at 24-25. Precinct 2215 is a majority-white precinct. DE179-16 at 24 (39.6% BVAP).

### C. District 3 changes

In addition to the foregoing changes to District 3, the Commission altered the northernmost boundary between Districts 3 and 4 to follow I-65 instead of a small stream. DE172 163:23-164:11. That required moving a portion of the Warrior Storm Shelter into District 3 (Precinct 3285). DE179-16 at 33. Both portions of that precinct are overwhelmingly white. *Id.* Plaintiffs' expert, Mr. Fairfax, testified that this change was "irrelevant to [his] racial gerrymandering analysis" and "didn't seem to add any evidence" of racial predominance. DE172 164:9-14. District 3's BVAP increased as compared to the 2013 Plan. DE179-16 at 31. Plaintiffs provided no other evidence specific to District 3.

### D. District 4 changes

In addition to the foregoing changes to District 4, the only remaining change to District 4 was the addition of the Hope Community Church (Precinct 4125), from

17

overpopulated District 5. DE179-16 at 35.[11] Precinct 4125 is majority white, with a BVAP of 8.6%, and adjacent to existing District 4. *Id.* at 36. District 4's BVAP increased as compared to the 2013 Plan. DE179-16 at 34-35. Plaintiffs presented no other evidence specific to District 4 at trial.

### E.    District 5 changes

There were no other changes to District 5 beyond the foregoing changes. Of the nearly 10,000 people removed from overpopulated District 5, more than 80% were white residents. DE179-19. As a result, District 5's BVAP increased as compared to the 2013 Plan. DE179-16 at 37. Plaintiffs provided no other evidence specific to District 5 at trial.

### F.    Plaintiffs' "illustrative" plans

**1.** Addoh-Kondi Plaintiffs' expert, Mr. Fairfax, offered an "illustrative" plan to show an alternative way of redistricting the county. DE169-107 ¶93. It was undisputed that his illustrative plan prioritized keeping nearly all municipalities whole and did not prioritize core retention. *Id.*; DE172 50:20-22, 178:13-15. The plan's overall core retention was 68.2%, DE179-16 at 43, compared to the Enacted Plan's 95.3%, DE169-26 at 14. The plan would also alter the political makeup of the Commission, flipping the existing President Jimmie Stephens's District 3 from a Republican district to a Democratic district. DE169-106; *see also* DE172 179:18-20

---

[11] The district court refers to this precinct by the VTD name of "McElwain Baptist Church." Op.76.

**2.** McClure Plaintiffs' expert, Mr. Cooper, also offered various "illustrative" plans. Each broke up Birmingham to a greater degree than the Enacted Plan. DE173 315:11-18. For example, while the Enacted Plan keeps nearly 95% of Birmingham in Districts 1 and 2, DE179-16 at 9, Cooper D kept only 81% of Birmingham in those two districts and moved another 14% into District 4 and 4.6% into District 5. DE169-85, DE169-88. Each of Mr. Cooper's plans had core retention rates well below the Enacted Plan, with Cooper Plans A, B, C, and E at 70.2%, 61.9%, 62.9%, and 71.2% respectively. DE179-16 at 43; DE85-3 at 14. Only Cooper D attempted to control for core retention, but its overall core retention of 85.74% materially trailed the Enacted Plan's 95.3% core retention. DE173 317:10-15. That plan also paired District 1's and District 4's incumbents in one district, DE173 328:13-14, and exceeded the Commission's stated +/- 1% population deviation goal, DE173 333:23-334:5. In addition, Mr. Cooper articulated an expressly racial purpose of Cooper D: to "reduce the overconcentration of black voters in District 1" and to lower the BVAP. DE173 323:17-324:2.

## G.   Simulation analyses

McClure Plaintiffs' expert, Dr. McCartan, and the Commission's expert, Dr. Barber, examined hundreds of thousands of computer-simulated redistricting plans to compare to the Enacted Plan. Most relevant here, Dr. McCartan created a "Core retention, strong" simulation set, also referred to as "Simulation Set 5," which contained 120,000 computer-drawn plans with core retention scores approximating that of the Enacted Plan. DE169-26 at 18 (showing 120,000 simulations ranging from 89.1% to

19

96.5% core retention); *accord Alexander*, 602 U.S. at 27 (faulting expert for failing to approximate enacted plan's core retention in simulation set).[12] When the Enacted Plan is compared against Simulation Set 5, the racial demographics of Districts 1 and 2 are well within the range of the racial demographics of tens of thousands of race-neutral, computer drawn districts that prioritize core retention. DE169-26 at 19, table 2. Dr. McCartan agreed that the BVAPs of Districts 1 and 2 are not statistical outliers when compared to the BVAPs of districts in simulations prioritizing core retention to a similar degree as the Enacted Plan. DE174 633:14-21; 641:20-22.[13]

## H.    Regression analyses

McClure Plaintiffs' expert, Dr. Liu, and the Commission's expert, Dr. Barber, performed regression analyses to probe what precincts were more likely to be added to districts. Both experts agreed that a precinct's adjacency to existing district lines was the strongest predictor of its inclusion in the 2021 districts, consistent with the goal of

---

[12] Dr. Barber created an initial simulation set, before *Alexander*, that did not control for core retention. DE175 797:9-19. After *Alexander*, Dr. Barber relied on Dr. McCartan's core retention Simulation Set 5. *Id.* at 798:6-24.

[13] Dr. McCartan separately compared simulations using his novel "packing-cracking score" never before used in litigation. DE174 593:23-25, 606:7-14. The scoring is simple arithmetic that averages the BVAP of the two highest BVAP districts, deemed to be "packed," and then subtracts the district with the third-highest BVAP, deemed to be "cracked," DE174 595:23-596:1. He derived the score using a simulation set that did not control for core retention. DE174 608:23-609. *But see Alexander*, 602 U.S. at 27. The score thus collapses district-specific information into one "summary statistic" for Districts 1, 2, and 3 and ignores Districts 4 and 5. DE174 544:20-545:1. *But see Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 263 (2015) (requiring district-by-district proof for racial gerrymandering claims).

20

making the fewest changes to the existing districts. DE169-22 at 3-4; DE173 418:15-18. Dr. Liu testified that his regression analysis showed that race was also a predictor for District 1, where higher BVAP precincts were more likely to be moved into the district. DE169-22 at 3-4. But Dr. Liu testified that he did not test the interaction of other variables, such as the population size of a precinct or the municipal neighborhoods included in that precinct, and he did not know if those non-racial features of precincts mattered or not. DE173 424:14-25. While Dr. Liu did not perform his preferred regression analysis for District 2, Dr. Barber did and found no statistically significant relationship between race and a precinct's inclusion in District 2. DE179-17 at 7.[14]

## V.    The district court's decision

Eight months after trial, the district court declared all five districts racially gerrymandered and permanently enjoined their use for future elections. Much of the court's decision recounted the historical background of redistricting in Jefferson County. Op.8-33, 97-107. Relegating *Alexander* to a footnote, the court excused Plaintiffs from the evidentiary burden of "untangl[ing] race from other permissible considerations" like "core preservation," 602 U.S. at 7, because of Jefferson County's "history" of complying with §5 of the VRA, Op.127 n.44. The court deemed routine, decades-old §5

---

[14] Dr. Liu also performed a racially polarized voting analysis to determine the extent to which the race of voters correlates with voter support for each candidate, DE173 371:18-20, based on his review of 11 state-wide biracial races and an "effectiveness analysis" to determine whether there were "too many Black voters" in a given district. DE173 390:16. Such analysis is for VRA §2 cases, not racial gerrymandering cases. DE173 408:23-25.

correspondence with DOJ, required to obtain preclearance for redistricting changes, as evidence of racial predominance today. Op.108. The court then recounted the racial demographics of precincts moved and deemed those racial demographics, combined with the county's past §5 correspondence, as sufficient evidence for a finding of racial gerrymandering. *See, e.g.*, Op.122-124, 129, 131-132, 134-135, 137. The decision makes no credibility findings regarding fact or expert witnesses. Nevertheless, the court summarily rejected non-racial explanations for the Enacted Plan as "not credible" and "post-hoc speculation." Op.92, 107, 128, 131, 136.

Plaintiffs submitted proposed remedial plans while the Commission appealed and sought a stay of the injunction pending appeal. Plaintiffs' proposals confirmed that the Commission's neutrally drawn 2021 districts would be replaced with gerrymandered ones. McClure Plaintiffs' proposed remedy would have carved large portions of Birmingham into four districts, segregated along racial lines, with a sprawling District 4 reaching into downtown Birmingham and extending to the eastern county line. DE213; DE216; DE216-1. Addoh-Kondi Plaintiffs' proposed remedy would have shifted thousands of Black voters from District 1 to 3, then shifted thousands of white voters from District 3 to District 1, with the effect of flipping the political makeup of the Commission. DE214; DE216; DE216-1. Before the district court chose between the proposals, this Court granted the Commission's motion for a stay pending appeal. Doc.30.

The order granting a stay pending appeal concluded that there was too little time to replace the 2021 districts, given substantial litigation delays and looming interim

election deadlines. *Id.* at 5-7. The order also acknowledged the Commission "made a substantial case on the merits that the district court did not rule out other plausible explanations or possibilities for the 2021 Plan," as *Alexander* requires. *Id.* at 12 n.7 (cleaned up). Judge Jordan dissented, concluding there was "no legal error here" but did not address *Alexander. Id.* at 14.

## STANDARD OF REVIEW

A permanent injunction is reviewed for an abuse of discretion. *M.H. by & through Lynah v. Comm'r of the Ga. Dep't of Cmty. Health*, 111 F.4th 1301, 1307 (11th Cir. 2024). A district court abuses its discretion if it applies an incorrect legal standard, makes findings of fact that are clearly erroneous, or applies the law in an unreasonable or incorrect manner. *Klay v. United Health Grp.*, 376 F.3d 1092, 1096 (11th Cir. 2004). Legal errors that "infect a so-called mixed finding of law and fact" and even fact findings "predicated on a misunderstanding of the governing rule of law" are reversible without deference to the district court. *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986) (quotation marks omitted); *see also, e.g.*, *Abbott v. Perez*, 585 U.S. 579, 607 (2018) ("whether the court applied the correct burden of proof is a question of law subject to plenary review"); *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187-88 (2017) (considering whether "the District Court misapplied controlling law"); *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015) (*ALBC*) (finding "determinations reflect[] an error about relevant law" that "likely affected" conclusions). A finding of fact is clearly erroneous when review

leaves this court with a "definite and firm conviction that a mistake has been committed." *United States v. Newman*, 614 F.3d 1232, 1235 (11th Cir. 2010).

## SUMMARY OF ARGUMENT

The district court did not hold Plaintiffs to their "especially stringent" burden to "rule out the *possibility*" of non-racial explanations for the Commission's district lines. *Alexander*, 602 U.S. 1, 11, 24 (2024) (emphasis added).

**I.** The district court never required Plaintiffs to "untangle race from other permissible considerations," including "core preservation." *Id.* at 7. Instead, the court rested its racial gerrymandering finding on the demographics of precincts moved (and not moved) during redistricting. The court rejected the Commission's legitimate and non-racial explanations, including core preservation or placing nearly all of Birmingham in Districts 1 and 2, as post-hoc speculation when viewing the Commission's past redistricting efforts through a racially tainted lens.

**II.** The district court fundamentally erred by inferring a present-day intent to racially gerrymander from the county's decades-old compliance with §5 of the VRA. The county's routine §5 correspondence reveals no evidence that prior district lines were drawn to hit some racial target or with the intent of moving voters based on their race. Regardless, past §5 compliance cannot amount to evidence of present-day racial intent.

The district court's fundamental "misunderstanding of what the law requires" would redefine *Alexander*'s "racial-predominance test" into a racial-predominance

*presumption* for all jurisdictions previously under preclearance. *Alexander*, 602 U.S. at 18-19. This is reversible error.

## ARGUMENT

The Fourteenth Amendment prohibits racial gerrymandering, "that is, intentionally assigning citizens to a district on the basis of race without sufficient justification." *Abbott v. Perez*, 585 U.S. 579, 585-86 (2018). A racial gerrymandering claim requires proof that "race for its own sake, and not other districting principles," provided the "dominant and controlling rationale" for drawing district lines. *Miller v. Johnson*, 515 U.S. 900, 913 (1995). To prove this, a plaintiff must "untangle race from other permissible considerations" to show that "race was the predominant factor motivating the … decision to place a significant amount of voters within or without a particular district." *Alexander*, 602 U.S. at 7. Plaintiffs must show that race was "the criterion that … could not be compromised," *Shaw v. Hunt*, 517 U.S. 899, 907 (1996), and that the resulting plan is "'unexplainable on grounds other than race,'" *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (*Cromartie II*). That means showing that lawmakers "'subordinated' race-neutral redistricting criteria such as compactness, contiguity, and core preservation to 'racial considerations.'" *Alexander*, 602 U.S. at 7.

All the while, courts must presume "legislative good faith," drawing an "inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Id.* at 10. Given that presumption, even the "possibility" of a non-racial explanation for district lines is "dispositive." *Id.* at 20. Plaintiffs

25

bear an "especially stringent" burden to overcome this presumption. *Id.* at 11. Although theoretically plaintiffs can overcome the presumption with circumstantial evidence, the Supreme Court has "never invalidated an electoral map in a case in which the plaintiff failed to adduce any direct evidence." *Id.* at 8.

Importantly, the Constitution does not impose "an *affirmative* obligation … to avoid creating districts that turn out to be heavily, even majority, minority." *Cromartie II*, 532 U.S. at 249. This is because the Equal Protection Clause prohibits "racial *purpose*," not racial effect. *Miller*, 515 U.S. at 913 (emphasis added). So it is not enough to show how racial demographics changed from one cycle to the next, because "impact alone is not determinative." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 & n.15 (1977). When racial demographics are simply "a side effect" of a non-racial redistricting criterion, there is no constitutional violation. *Alexander*, 602 U.S. at 20.

But here, the district court disregarded the presumption of good faith and conflated racial "side effect[s]" with racial intent, inferring racial purpose at every step. *Id.* at 10, 20. There was no basis for relegating *Alexander* to a footnote and relieving Plaintiffs of their "especially stringent" evidentiary burden. *Id.* at 11. Nor was there any basis for inferring present-day bad faith from the county's compliance with §5 of the VRA in decades past.

26

## I.  The disregard for *Alexander* is reversible error.

### A.  *Alexander* dictates the ground rules for this case.

If there were any ambiguity about the ground rules for Plaintiffs' racial gerrymandering claims when Plaintiffs sued, *Alexander* removed it last year. *Alexander* described a racial gerrymandering plaintiff's task as follows: "[A] plaintiff must prove that the State subordinated race-neutral districting criteria such as compactness, contiguity, and *core preservation* to racial considerations." 602 U.S. at 7 (emphasis added; quotation marks omitted). The plaintiff must "untangle race" from such non-racial explanations. *Id.* at 6. Racial gerrymandering, therefore, cannot be proved with racial demographics alone, which might simply be a "side effect" of such non-racial explanations. *Id.* at 20.

With only a footnote, the district court rejected *Alexander*'s application in these racial gerrymandering cases and excused Plaintiffs from *Alexander*'s requirement of untangling race from non-racial explanations. Op.127 n.44. In the district court's words, the "record here is different from the record in *Alexander* in significant respects." *Id.* The district court never identified any such differences. It said only that "core retention in this case does not represent a race-neutral redistricting criterion *given the history of the 2013 map*." *Id.* (emphasis added). But that "history" was simply the county's past compliance with §5 of the VRA and letters sent to DOJ in 2013 and the decades before. *See infra* II.A.

If that "history" of VRA compliance were enough to make what *Alexander* says about ruling out "core preservation" inapplicable, *see Alexander*, 602 U.S. at 7, then core

27

preservation should have gone undiscussed in *Alexander* itself. South Carolina, like Jefferson County, was also subject to §5 before *Shelby County*.[15] Indeed, the *Alexander* district court recounted how past plans split Charleston "to satisfy the then existing non-retrogression requirements of Section 5 of the Voting Rights Act" on its way to holding that the present-day split was racially gerrymandered. *S.C. NAACP v. Alexander*, 649 F. Supp. 3d 177, 190 (D.S.C. 2023). The Supreme Court reversed, and South Carolina's past §5 compliance did not even warrant a footnote in the opinion. The Supreme Court did not require South Carolina to start with a "blank slate" because of its past §5 compliance. 602 U.S. at 27. Just the opposite; it held plaintiffs to their "especially stringent" evidentiary burden, *id.* at 11, including "rul[ing] out core retention," and criticized plaintiffs' experts who failed to do so, *id.* at 27, 33. No different than *Alexander*, the question here should have been whether race or *anything* else, including "core preservation," explains the 2021 Enacted Plan. *Id.* at 7.

The whole framework for the district court's decision is thus "predicated on a misunderstanding of the governing rule of law." *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986) (quotation marks omitted). By ignoring undisputed non-racial explanations for the Enacted Plan as *Alexander* required, the district court "misapplied controlling law." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187-88 (2017). There can be no doubt that "error about relevant law … affected" the district court's racial

---

[15] *Jurisdictions Previously Covered by Section 5*, U.S. Dep't of Just. C.R. Div. (last visited Nov. 7, 2025) https://perma.cc/HFP2-BK47.

gerrymandering finding. *Ala. Legis. Black Caucus v. Ala*, 575 U.S. 254, 262 (2015) (*ALBC*). The most obvious, non-racial explanations for the Enacted Plan went ignored, even though *Alexander* states the "possibility" of *any* "plausible" non-racial explanation "is dispositive." *Alexander*, 602 U.S. at 20, 27.

### B. Plaintiffs did not rule out non-racial explanations for the Enacted Plan.

There are non-racial explanations for every change in the Enacted Plan, among them core preservation, municipal communities, political considerations, and elections administration concerns. Disregarding *Alexander*, the district court erroneously dismissed these non-racial explanations as "post hoc" justifications in its cursory analysis of each district. Op.128, 131, 133, 136, 138.

### 1. Non-racial political explanations, including core preservation

It is undisputed that core retention explains the Enacted Plan overall. The experts here agreed that incumbents have an interest in keeping as much of their original districts as possible to retain as many of their constituents as possible. DE175 757:1-12; DE173 327:18-23; DE172 82:4-7. The Commissioners themselves publicly confirmed that their starting point was the existing 2013 map and that no one likes "change" or "giv[ing] up people." *Supra* p.6. All five Commissioners were incumbents seeking reelection and wishing to retain their constituents to "shore up some political support." *Supra* p.4-6; DE172 82:4-11. As Plaintiffs' expert Mr. Cooper agreed, Commissioners might take steps to "bolster their voter base" when redistricting. DE173

328:1-6. A plan with high core retention effectuates that goal. DE175 757:1-7. And here, the resulting core retention of the Enacted Plan exceeds 95% overall and 90% in each district. DE169-26 at 14; DE179-16 at 7, 43.

*Alexander* left no doubt that Plaintiffs were required to rule out "core preservation" as a permissible explanation for the Enacted Plan. 602 U.S. at 7; *see also Karcher v. Daggett*, 462 U.S. 725, 740 (1983) (noting "preserving the cores of prior districts" is a "legitimate objective[]"). If racial demographics are simply a "side effect" of core preservation, then Plaintiffs have failed to overcome their stringent evidentiary burden. *Alexander*, 602 U.S. at 20. Failing to rule it out "betrays a blinkered view of the redistricting process" because "[l]awmakers do not typically start with a blank slate" when redistricting. *Id.* at 27.

The district court erroneously excused Plaintiffs from that burden. Op.127 n.44. Plaintiffs and their experts failed to account for core retention, little different than the experts faulted for ignoring core retention in *Alexander*, 602 U.S. at 27, 33. Plaintiffs' illustrative maps largely ignored the existing districts, with overall core retention scores ranging from 50.8% to 85.7%. DE85-3 at 14; DE169-26 at 24; DE179-16 at 43. Only Cooper D even attempted to preserve district cores but still fell nearly 10% short overall and redrew Districts 1 and 4 so dramatically that their commissioners would be paired when seeking re-election. DE172 282:15-18; DE173 328:13-14. That is "disqualifying." *Christian Ministerial All. v. Jester*, 786 F. Supp. 3d 1134, 1144-45 (E.D. Ark. 2025) (three-judge court) (faulting 4.6% discrepancy); *Alexander*, 602 U.S. at 27 (faulting 14%

30

discrepancy). These and other non-racial differences[16] between the Enacted Plan and Cooper D explain the differences in racial demographics between those plans, without presuming some racial purpose. *See Jester*, 786 F. Supp. 3d at 1144.

When Plaintiffs did account for core retention, the Enacted Plan proved to be no outlier. Dr. McCartan's Simulation Set 5 contained tens of thousands of simulations that approximated the core retention of the Enacted Plan. *Supra* p.20. Dr. McCartan repeatedly testified that Districts 1 and 2 were not outliers compared to those race-neutral simulations. DE174 630:14-18, 641:20-22. Dr. Barber agreed, adding that the racial demographics of Plaintiffs' plans, unlike the Enacted Plan, bore no resemblance to those race-neutral simulations. DE179-17 at 5-6. But the district court did not account for any of this, instead clearly erring by finding the Enacted Plan was an "outlier." Op.58. As the district court elsewhere acknowledged, nearly 10% and 50% of those race-neutral simulated plans had BVAPs *higher* than Enacted Districts 1 and 2 respectively. Op.61 & n.29; *see also* DE169-26 at 19. The district court cited nothing for its later finding that the Enacted Plan was an outlier compared to Simulation Set 5, and Dr. McCartan and Dr. Barber each testified to the contrary. DE174 630:14-18, 641:20-

---

[16] Cooper D also fails to control for other Commission goals, including the +/-1% population deviation, keeping Birmingham mostly in Districts 1 and 2, and protecting incumbents. *See supra* p.19.

22; DE175 801:2-15; *see also* DE169-26 at 19.[17] Plaintiffs did not just fail to untangle core retention; they affirmatively showed that it explains the Enacted Plan.

Other political explanations also went ignored. For example, precincts added to the northeast side of District 1 cover neighborhoods in Commissioner Scales's former Birmingham City Council district. *Supra* p.12. Areas added on the western side are near her church. *Id.* The areas added to District 2 cover Bessemer, where Commissioner Tyson outperformed her opponent in the previous election. *Supra* p.15-16. And the part of Bessemer that remains in District 3 contains Commissioner Stephens's home. *Id.* Meanwhile, Cooper D paired the incumbents from District 1 and District 4 in the same district. DE173 328:13-14. And Mr. Fairfax's illustrative plan converted the Commission President's district from Republican to Democratic. DE172 179:13-20. Plaintiffs cannot rule out the possibility that differences in resulting racial demographics between the Enacted Plan and their experts' illustrative plans are explainable by these divergent political considerations. *But see Alexander*, 602 U.S. at 20, 34.

### 2.  Non-racial municipal explanations

Keeping municipalities entirely within one district is difficult in Jefferson County because of continuous and sometimes far-flung municipal annexations, which create

---

[17] Any reliance on Dr. McCartan's bespoke "packing-cracking score," *supra* p.20 n.13, betrays a misunderstanding of the governing law requiring district-specific proof from Plaintiffs. *See ALBC*, 575 U.S. at 263. To develop that "packing-cracking score," moreover, Dr. McCartan testified he relied on simulations that did not approximate the Enacted Plan's core retention, DE174 608:23-609:7, which is reversible error after *Alexander*. 602 U.S. at 27.

unwieldy municipal lines. Op.46; DE174 705:12-19. But that is not to say that the municipal neighborhoods contained in the redistricted precincts were irrelevant. *Contra* Op.118. The Enacted Plan still keeps large portions of the county's large municipalities of Birmingham, Bessemer, and Homewood together in fewer districts. DE172 82:20-23, 175:17-24. Even though municipalities are split in the Enacted Plan,[18] those municipal splits are minimized by treating cities as communities of interest and placing parts of the county's largest cities into districts already containing portions of those cities—a permissible, non-racial redistricting goal. DE175 769:10-14; DE172 50:23-25, 175:17-24; DE173 314:8-14.

Applied here, it is undisputed that most of Birmingham has been placed in Districts 1 and 2 from the beginning of single-member districting in Jefferson County. Op.14. In the Enacted Plan, nearly 95% of Birmingham is in Districts 1 and 2. DE179-16 at 9. Every precinct added to District 1 "contain[ed] Birmingham neighborhoods,"

---

[18] The district court clearly erred by repeating Plaintiffs' error in their proposed findings about the number of split municipalities in the Enacted Plan. The district court made a factual error in finding splits that do not exist, and a legal error by "infer[ring] that, in deciding to split municipalities in the 2021 plan," most of which were already split in the previous plan, "the commissioners did so predominantly because of race." Op.118. The court listed Brighton, Fultondale, Midfield, Trussville, and Tarrant as split, but those municipalities remain wholly within one district in the Enacted Plan. DE169-108 at 22, 117, 119, 121. Homewood, Hoover, Irondale, Bessemer, Center Point, and Leeds were *already* split in the 2013 plan, so the Enacted Plan did not introduce any new split of those municipalities. *See id.* at 16 (2013 map showing these municipalities). The district court's finding that municipalities were split along racial lines has no accompanying citation. *Id.* Such findings, devoid of evidence, are clearly erroneous. *Ellard v. Ala. Bd. of Pardons & Paroles*, 928 F.2d 378, 382 (11th Cir. 1991) (clearly erroneous where "there is nothing in the record to establish" fact).

33

Op.62, thereby uniting more of Birmingham in District 1. *Supra* p.11-14. Likewise for District 2, every precinct added contained Birmingham, Bessemer, and Homewood residents—municipalities long part of that district. *Supra* p.14-17. Detailed in the district-by-district discussion below, the district court faulted the Commission for not adding precincts with other municipal neighborhoods, but that is a criticism about the Commission's use of a non-racial criteria for redistricting, not a racial one. *Infra* I.C.1-2.

Of course, anchoring Districts 1 and 2 in Birmingham will have a racial *effect*, just as any redistricting decision will. But racial effects are not forbidden racial intent. *Alexander*, 602 U.S. at 20; *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Birmingham is a predominantly Black city, so any district anchored in Birmingham will have a correspondingly high BVAP. DE179-16 at 9. Dr. Barber analogized this demographic effect to districts in majority-Black Detroit at issue in Michigan redistricting litigation, DE175 760:11-761:10, where the constitutional violation was in the *carving up* of Detroit. *See Agee v. Benson*, No. 1:22-cv-272, 2023 WL 8826692 (W.D. Mich. Dec. 21, 2023). There, a three-judge panel enjoined Michigan districts as unconstitutional because they were purposely drawn "to *reduce* the percentages of black voters" in Detroit-area districts by cracking Detroit's Black population across many districts. *Id.* at *39, 41-52. As a remedy, the panel directed mapmakers to "do better at keeping Detroit whole." DE175 761:7-10. And the effect of keeping Detroit whole was that the BVAPs of districts anchored in Detroit "saw dramatic increases" because those "districts inherit the demographics of the population." *Id.* 760:15-18, 762:7-8. Such demographic effects—

whether in Jefferson County or Detroit—are not evidence of racial gerrymandering. They are merely a "side effect" of a race-neutral redistricting goal. *Alexander*, 602 U.S. at 20. The Commission has no "affirmative obligation" to avoid these effects by unmooring Districts 1 and 2 from their longtime anchor in Birmingham. *Cromartie II*, 532 U.S. at 249.

### 3.    These and other non-racial explanations are not "post hoc speculation"

Such non-racial explanations apparent from the map itself and borne out by the extensive trial record, including Plaintiffs' experts' testimony, are not "post hoc" justifications. *Contra* Op.128, 131, 133, 136, 138. They are what *Alexander* calls "alternative explanation[s]." 602 U.S. at 8.

The district court erred by conflating the explanations offered in this case with those in *Bethune-Hill*. There, it was "undisputed" that Virginia had an "express racial target" during redistricting. 580 U.S. at 182, 192. Despite that clear evidence of racial intent, Virginia tried to justify its districts with "post hoc" rationales. *Id.* at 189-90. Here, the district court found there were no racial targets in 1985, the VRA was not even discussed in the immediately preceding 2013 redistricting process (let alone racial targets), and the district court made no finding of any such targets in 2021. *Supra* p.3. On those facts, dismissing race-neutral explanations as speculation misreads *Bethune-Hill* and disregards *Alexander*.

C. **Plaintiffs did not prove race predominated in any district.**

Plaintiffs' gerrymandering claims "appl[y] district-by-district." *ALBC*, 575 U.S. at 262. While racial gerrymandering plaintiffs may present plan-wide evidence, their burden remains to prove that race predominated in the drawing of "a particular district," and an "undifferentiated [plan-wide] analysis is insufficient" to make that showing. *Id.* at 262-64. Here, there was no district-specific evidence that race alone explains any one of the Commission's five districts. The evidence showed just the opposite, revealing myriad non-racial explanations for each of the Commission's five districts.

1. **District 1**

Core retention, municipal neighborhoods, other political considerations, and concerns about elections administration explain the changes to District 1. *Supra* p.11-14. More than 99% of residents previously districted in District 1 remained in District 1 in the Enacted Plan; as a result, District 1's racial demographics remained mostly the same. DE179-16 at 7, 10; *see* Op.54.

Only one precinct was removed from District 1; it contained only 89 people and was moved in response to elections administration concerns—a non-racial explanation that remains undisputed. DE179-16 at 12. And yet, irreconcilable with *Alexander*'s presumption of good faith, the district court found it "particularly telling" that the Commission moved that precinct given its 24.2% BVAP. Op.124. Far more telling is that Plaintiffs' experts never mentioned the Brookside precinct as evidence of racial purpose

at trial. That 89-person precinct could not meaningfully alter the district's racial demographics, and there was an undisputed non-racial explanation for moving it.

Of the precincts moved into District 1 to repopulate the district, every precinct contained Birmingham neighborhoods, Op.62, further consolidating Birmingham in Districts 1 and 2, *supra* p.9, 11-14. Those Birmingham neighborhoods included those previously represented by Commissioner Scales on the city council and those near her church—common political explanations for those and other areas that Commissioner Scales described as "highly Democratic." *Supra* p.11-14. The district court rejected these alternative explanations without any basis. It misunderstood applicable law by pointing only to demographics of precincts moved, demographics of precincts that could have moved, and the historical demographics of districts going back decades, rather than any evidence of predominant racial purpose in 2021.

*First*, the district court faulted the Commission because all precincts moved into District 1 were "majority-Black." Op.123. The court posited the Commission could have added "other adjacent precincts" instead that "would have lowered District 1's" BVAP. Op.123; *see also* Op.133 (claiming that by moving other precincts, the Commission "would have achieved its equal population goal *while removing fewer Black voters from District 3*"). But racial gerrymandering cannot be proved with racial demographics alone. *Alexander*, 602 U.S. at 20; *Miller*, 515 U.S. at 914 ("'impact alone is not determinative'").

37

And the Commission had no "affirmative obligation" to reduce the Black population in District 1. *Cromartie II*, 532 U.S. at 249.[19]

*Second*, the district court erroneously faulted the Commission for splitting Center Point, saying the movement of Center Point-area precincts from District 4 to District 1 "effectively split the city of Center Point in half." Op.65, 123. But of course, splitting municipalities does not violate the Constitution. *See Bethune-Hill*, 580 U.S. at 189. And Center Point was already split in the 2013 plan, with a portion already in District 1. DE174 675:8-12. The district court clearly erred when suggesting that the Commission could have left those precincts alone and "eliminated the split of Center Point in the 2021 plan." Op.135. These changes simply added to the Center Point neighborhoods already in District 1. DE174 675:8-12.

*Third*, the district court wrongly rejected non-racial political explanations for including those Center Point-area precincts. The precincts contained not only Center Point neighborhoods, but also sizeable Birmingham neighborhoods previously represented by Commissioner Scales on the city council. *Supra* p.12. The court said that explanation could be disregarded because "Commissioner Scales voted against the 2021 plan" and must not have "participated meaningfully in the map-drawing process."

---

[19] Erroneously imposing an "affirmative obligation" to avoid Black supermajority districts, *but see Cromartie II*, 532 U.S. at 249, the district court and Plaintiffs repeatedly faulted the Commission for not injecting race *enough* into the redistricting process. *E.g.*, Op.20, 27, 30-32, 98, 100, 101, 107, 119, 123-29, 138 n.50 (criticizing, *inter alia*, lack of "racially polarized voting" analyses and movement of Black Birmingham precincts instead of white non-Birmingham precincts); *see also* Doc. 27 at 3, 11-12.

Op.125. But Commissioner Scales herself said at the public hearing that adding these areas—which would have been added in every one of the redistricting proposals—was going to be "good for Scales" as they were "highly Democratic." DE179-8 38:6-12.

*Fourth*, the district court faulted the Commission for adding Birmingham precincts to District 1 instead of non-Birmingham precincts with lower BVAPs, as follows:

- The district court found that the Commission could have moved Adamsville's Adamsville Baptist Church (Precinct 3120) and the Town of Mulga's Mulga Town Hall (Precinct 3290) from District 3 into District 1 instead of Precincts 1065, 1125, and 1365, all with Birmingham neighborhoods. Op.133. Those alternative precincts are not Birmingham precincts, DE172 152:13-23; 153:22-154:2, and the precinct populations would have been well short of the population needed to repopulate District 1 within +/-1% of ideal population. DE169-108 at 134, 142 (identifying precinct populations); DE179-16 at 15.

- The district court found the Commission could have moved Tarrant's Tarrant City Hall (Precinct 4070) instead of Precinct 1125, with both Birmingham and Center Point neighborhoods. Op.135. That would have added a new municipality to District 1 (Tarrant), while excluding Birmingham and Center Point neighborhoods, even though Birmingham and Center Point were already in District 1. *See* DE169-108 at 58 (showing 100% of Tarrant was in District 4 in 2013).

- The district court found the Commission could have added all of the Center Point Community Center (Precinct 4060) (or the "East Pinson Valley" VTD) to District 1. But that whole precinct also includes the municipality of Pinson. Adding the entire precinct would have split Pinson between District 1 and District 4, even though it has been entirely contained in District 4 in the 2013 plan and before. DE169-108 at 20; DE174 678:2-3. Moreover, adding all of that 8,000-person precinct would have overpopulated the district. DE179-16 at 15; DE174 677:6-10.

There is nothing unconstitutional about the Commission's adding more Birmingham neighborhoods to a Birmingham-anchored district. *Supra* I.B.2. Conversely, the

39

suggestion that the Commission should have added non-Birmingham precincts for the purpose of lowering District 1's BVAP would be impermissibly race-based.

*Fourth*, the district court found that "the Commission consistently adjusted District 1 "to follow Black population growth beyond the City of Birmingham," Op.110-11, and "tracked Black population," Op.101. It pointed to the municipalities of "Tarrant, Center Point, and Fultondale" as outside District 1 in the 1990s but now "in District 1" and having "significant Black populations." Op.38-39. But these findings are belied by the district court's own findings and undisputed facts regarding the Enacted Plan.

Where to begin? First, the district court found every precinct added to District 1 in the Enacted Plan contained Birmingham neighborhoods, not some far-flung municipality. Op.62. Second, Tarrant and Fultondale remain entirely within *District 4* in the Enacted Plan, not District 1, and Center Point was already in District 1 in 2013. DE169-108 at 16, 22, 117, 121. The court clearly erred. *See Ellard*, 928 F.2d at 382 (finding is clearly erroneous when "totally unsupported by the record"). Most fundamentally, the notion that the Enacted Plan "tracked" Black residents reverses the presumption of legislative good faith. *Contra Alexander*, 602 U.S. at 10. District 1 has been in the center of Jefferson County since 1985. DE176-3 at 2. As central Jefferson County's population decreased, District 1 expanded outward to equalize population across districts as the Constitution requires. It did so in 2021 by picking up indisputably Birmingham precincts for the Birmingham-anchored District 1. Op.62. The district court erred by

40

presuming simply from the changing demographics of precincts over time that the Commission must have picked them because of race. *Contra Alexander*, 602 U.S. at 10.

*Fifth*, the district court erred by concluding Plaintiffs' experts' other analyses suggested race predominated in District 1. Discussed above, neither the illustrative plans nor Dr. Liu's regression analysis controlled or accounted for non-racial criteria. *Supra* p.19, 21; *contra Alexander*, 602 U.S. at 31, 33. Conversely, when Plaintiffs' expert did account for core retention, Dr. McCartan agreed that District 1 was not an outlier and resembled thousands of computer-drawn plans. *Supra* p.20. The district court's finding to the contrary—calling District 1 an "outlier," Op.61, 128 n.45—has no basis in evidence and is clear error. *Ellard*, 928 F.2d at 382. And that erroneous finding, to the extent it relies on simulation sets failing to control for core retention, disregards *Alexander*'s admonition that comparisons should be made only to simulations that account for core retention to a similar degree as the Enacted Plan. 602 U.S. at 27.

### 2. District 2

Core retention, municipal neighborhoods, other political considerations, and concerns about elections administration likewise explain the changes to District 2. For District 2, 100% of residents previously districted in District 2 remained in the district. DE179-16 at 7. Of the six precincts moved into District 2 to repopulate the district, all contained Birmingham, Bessemer, and Homewood neighborhoods—all municipalities long included in District 2. *Supra* p.14-17. It is little surprise that District 2 expanded farther into contiguous Bessemer precincts, an area where Commissioner Tyson

outperformed in a runoff election before redistricting. *Supra* p.17. Also unsurprising was the Homewood-area change to reunify Oxmoor Valley Community Center (Precinct 2350) in the Enacted Plan, which was previously split between Districts 2 and 5. Experts agreed reunifying the Oxmoor precinct was a non-racial explanation that improved elections administration. *Supra* p.15.

It is undisputed that the majority of residents from these added precincts were white, including overwhelmingly white Homewood-area precincts with substantial populations. DE179-19; *supra* p.14-15. As a result, District 2 was the only district to *decline* in BVAP. *Supra* p.14. For that reason, Addoh-Kondi Plaintiffs' expert testified he could not conclude race predominated in District 2 when looking at District 2 alone. DE172 84:6-12. The district court had no basis for ignoring not only these non-racial explanations for changes to District 2, but also the resulting racial demographics, which further contradict any racial gerrymandering finding.

*First*, the district court zeroed in on the Commission's splitting the Bessemer Civic Center (Precinct 2245), because that precinct was predominantly Black and "cut[] so deeply into Bessemer." Op.129. The court never mentioned that adjoining areas of Bessemer have always been in District 2, DE176-3 at 5, that the areas included in District 2 are "heavily residential," while the areas remaining in District 3 are more "rural," DE174 692:6-17, or Commissioner Tyson's past election success in Bessemer, DE174 689:18-20.

42

*Second*, the district court faulted the Commission for splitting the Ross Bridge Welcome Center (Precinct 2365), based on racial demographics, Op.129 n.46, again ignoring alternative explanations for that precinct split. Plaintiffs' expert did not dispute that precinct was split along municipal lines and a major roadway, moving the precinct's Birmingham portion into Birmingham-based District 2 while leaving its Hoover portion in District 3. *Supra* p.15-16.

*Third*, the district court jettisoned the presumption of good faith when it acknowledged that the addition of majority-white Bessemer and Homewood precincts "did not meaningfully alter District 2's" BVAP but nevertheless were evidence of racial predominance because those precincts have "growing Black communities" that might increase District 2's BVAP "in the coming years." Op.130. Finding predominance on such speculation vitiates *Alexander*'s presumption of good faith. 602 U.S. at 10. Not only does it presume racial intent from demographics alone, it presumes intent from *predicted future* demographics, replacing the presumption of good faith with a presumption of racially discriminatory fortune-telling. *Contra id.* Moreover, faulting the movement of those precincts because they do not "meaningfully alter" District 2's BVAP assumes there is some "affirmative obligation" to meaningfully alter a district's BVAP. There is no such duty, lest the prohibition on race-based redistricting become a prescription for it. *See Cromartie II*, 532 U.S. at 249.

*Fourth*, the district court ignored expert testimony that race did not predominate in District 2. Noted above, Mr. Fairfax testified he had not concluded race

43

predominated in District 2 when looking at District 2 "alone." DE172 84:6-12. Using Dr. Liu's preferred regression, Dr. Barber found no statistically significant relationship between race and precincts moved into District 2. DE179-17 at 7. And District 2 resembled tens of thousands of race-neutral computer-drawn simulations that accounted for core retention as *Alexander* requires; District 2 was no outlier. DE169-26 at 19.

*Fifth*, the district court said race predominated given Commissioner Tyson's post-vote statements discussing both the politics and racial demographics of three discrete areas added to District 2. *Supra* p.7; Op.120-122. Her statements, again made *after* the Commission voted on the Enacted Plan, were in response to criticism from Commissioner Scales about "Republican" areas added to District 2. *Supra* p.7. They show at most an awareness of racial demographics, not intent. *See Allen v. Milligan*, 599 U.S. 1, 30-31 (2023) (addressing the difference between race consciousness and racial predominance). Commissioner Tyson never said those areas were added *because of* their racial composition, only that she was "aware" of it. *Miller*, 515 U.S. at 916. Nor can any reading of these statements overcome the undisputed fact that the percentage of white residents added to District 2 caused the BVAP to decline. *Supra* p.7, 14.

*Finally*, and relatedly, the district court said race predominated given self-serving testimony from two Plaintiffs who said they had conversations with Commissioner Tyson following redistricting, suggesting redistricting changes had been forced on Commissioner Tyson and that her district had more Black voters than necessary. Op.81; *see* DE173 447:5-9; *see also* DE174 522:1-5 (testifying Commissioner Tyson told him to

contact Plaintiffs' attorney). These statements are hearsay, and the Commission objected to their admission at trial. DE173 443:13-23; DE174 520:9-14; *see United States v. Baker*, 432 F.3d 1189, 1206 (11th Cir. 2005) (abuse of discretion to admit statement based on hearsay). Even if properly admitted, these statements come nowhere near a showing of predominance, and do not suggest the Commission redistricted with race in mind. As for the notion that Commissioner Tyson's district contained more Black voters than necessary, there is no "*affirmative* obligation … to avoid creating districts that turn out to be heavily, even majority, minority." *Cromartie II*, 532 U.S. at 249. Moreover, such purported "statement[s] by a single [commissioner are] not fairly read to demonstrate discriminatory intent" by the entire Commission. *LWV of Fla. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022); *see also Brnovich v. DNC*, 594 U.S. 647, 689-90 (2021). And the inferences drawn from such statements ignore Commissioner Tyson's public support and vote *for* the Enacted Plan. DE179-8 35:7-17; 39:14-15.

### 3. Districts 3, 4, and 5

Plaintiffs offered no district-specific evidence regarding changes to Districts 3, 4, and 5 at trial, beyond the changed racial demographics of those districts. That lack of district-specific proof was reason *not* to enjoin their use. *See ALBC*, 575 U.S. at 263.

It is undisputed that those districts stayed the same, retaining all existing constituents, except for precincts moved to resolve overpopulation. DE179-16 at 7. The court faulted those minimal changes based on racial demographics alone. The court remarked that "because the individuals the Commission moved in and out of District 3 facilitated

45

the Black supermajority in District 1 and the near supermajority in District 2," it was gerrymandered. Op.132. The court said "[t]he redrawing of District 4 to decrease District 4's BVAP supports the inference" that race predominated. Op.134. And the court observed that keeping other precincts in District 5 "would have given District 5 a higher BVAP." Op.76. But predominantly minority or majority districts are not unconstitutional, *Cromartie II*, 532 U.S. at 249, and demographic changes alone are not enough to show "racial purpose." *Miller*, 515 U.S. at 913; *see, e.g.*, *Alexander*, 602 U.S. at 20.

With respect to Districts 3 and 4 specifically, the district court faulted the Warrior-area change at the county's northernmost point. The district court found the movement of part of the Warrior Storm Shelter precinct from District 4 to District 3 "telling[]," Op.132, but even Plaintiffs' expert agreed that change was "irrelevant," DE172 164:12-14. The race neutral explanation for that change—following I-65—is obvious from the map and defeats any predominance finding. DE172 163:23-164:11.

With respect to District 5, the district court faulted the Commission for moving Homewood-area precincts ranging from 13.9% to 59.2% BVAP from District 5 to District 2. Op.76. By the district court's logic, the Commission should have removed precincts with even lower BVAPs from District 5. *Id.* Discussed above, the movement of these precincts simply added more Homewood neighborhoods to District 2, reunited a precinct split in the 2013 plan, and worked to resolve District 5's overpopulation. DE169-108 at 18, 22; DE174 695:9-16; DE172 95:2-10 (uniting precinct is a common redistricting goal and not evidence of racial predominance). And yet, the district court

46

refused to account for those non-racial explanations. Most telling is the court's error with respect to the Oxmoor Valley Community Center (Precinct 2350), previously split in the 2013 plan between Districts 2 and 5 and reunified in the Enacted Plan. Op.137 n.49. The district court's reason for ignoring that non-racial explanation was because of "testimony that the commissioners did not focus on *municipal splits*" given frequent municipal annexations. *Id.* (emphasis added). That erroneously conflates municipal splits with precinct splits and ignores agreement from Plaintiffs' own expert that the reunification of the precinct was a non-racial explanation. DE172 95:2-10.

*

All told, the district court's decision contains clearly erroneous findings with an absence of actual evidence, while ignoring non-racial explanations and inferring intentional discrimination from racial demographics alone. That decision is incompatible with *Alexander* and warrants reversal.

## II. Past §5 compliance is not evidence of present-day racial gerrymandering.

The only remaining basis for the district court's finding of racial gerrymandering was the county's past correspondence with DOJ as part of its past §5 compliance. The district court relied on that "history of the Commission's consistent report to DOJ" regarding each district's demographics to flip the presumption of good faith and infer "that the Commission continued its decades-long practice in 2021." Op.105. Old letters to DOJ are not evidence of predominance in 2021.

47

## A. The §5 correspondence contains no evidence of racial targets in past redistricting.

The district court clearly erred by finding anodyne §5 correspondence was evidence of a decades-old racial goal of drawing districts to hit a 65% racial target. Op.98, 117. The district court's finding that §5 correspondence was "direct evidence of the Commission's intent" to gerrymander in past cycles lacks support in the record and misapprehends the standard for racial predominance. Op.104; *see United States v. Newman*, 614 F.3d 1232, 1238 (11th Cir. 2010) (clear error where "finding was unsupported by the record").

**1.** With respect to the 1985 consent decree, the district court itself found that it "did not provide explicit racial targets in Districts 1 and 2." Op.14. But elsewhere in its order, the district court describes "the 65% threshold in the consent decree," Op.117, and "racial thresholds established by the Commission in 1985," Op.98, despite finding there were no such racial targets. This is clear error. *See Newman*, 614 F.3d at 1238.

As for the county's §5 submissions over the decades, all submissions simply discussed the "anticipated *effect*" of redistricting changes. DE169-2 at 2 (emphasis added). The "effect" of the 1985 change was that Black voters "will have a greater opportunity to elect 2/5 or 40% of the County Commission positions." *Id.* Letters for subsequent decades included similar language. DE169-3 at 3; DE169-6 at 10-11; DE169-111 at 9. None articulates any racial target. In 2001, the only reference to the county's "intended" goal was that redistricting was "intended to provide for districts of substantially equal

48

population." DE169-6 at 10. And in 2013, the VRA did not even come up during re-districting discussions, let alone a 65% racial target. DE174 726:17-21. The county confirmed in letters to DOJ only *after* the districts were drawn that districts continued to comply with the VRA, as required by §5 before *Shelby County*. DE174 711:7-15; DE169-111 at 8. The 2013 letter simply recounted the resulting demographics of Districts 1 and 2 to be "in excess of 65%." *Id.* at 9.

The §5 letters are far too thin a reed to presume unlawful racial purpose. As Plaintiffs' own expert explained, a majority-Black district exceeding 65% BVAP can result even when districts are redrawn with non-racial reasons in mind. Mr. Fairfax acknowledged that a map drawer can draw districts resulting in a 65% BVAP following race-neutral goals "without thinking about race at all." DE172 183:21-184:13.

**2.** The district court also had no legal basis for concluding the §5 letters were evidence of racial predominance in past decades. At most, a letter's descriptions of demographics shows racial awareness after redistricting, "but it does not follow" from mere awareness "that race predominate[d] in the redistricting process," *Miller*, 515 U.S. at 916, and it certainly does not follow that race predominated a decade or more later in *2021*, *infra* II.B. Likewise, a letter's statement that districts provide Black voters "with a greater opportunity to elect" their preferred candidates—language that echoes the VRA—and providing data to check that assertion is not evidence of predominance. *But see* Op.14, 108, 109 n.41. It should come as no surprise that §5 letters identified

49

demographics of districts when, to obtain DOJ's preclearance, the county was required to discuss the *effect* of redistricting. *See Clark v. Roemer*, 500 U.S. 646, 658 (1991).

The Supreme Court has never held that compliance with §5 is mutually exclusive with compliance with the Fourteenth Amendment. In fact, the Supreme Court was clear in *Shelby County*: though §4's coverage formula was unconstitutional, the Court "issue[d] no holding on §5 itself." 570 U.S. 529, 557 (2013). Even in cases with evidence that plans were drawn in pursuit of "an express racial target," such evidence was just one factor that the court would have to consider as part of a "holistic analysis" to determine predominance. *Bethune-Hill*, 580 U.S. at 192. Those Supreme Court precedents cannot be reconciled with the district court's decision here, which deemed the county's past VRA compliance as categorically unconstitutional "[r]emedial racial gerrymandering." Op.88. If past correspondence with DOJ under §5 were enough to show racial predominance, then the constitutionality of every majority-minority district in every jurisdiction previously covered by §5 would be in question.

**3.** The record in this case differs substantially from the cases cited by the district court. In *Cooper v. Harris*, North Carolina's 50% BVAP target was undisputed. 581 U.S. 285, 299-300 (2017). In *Miller*, Georgia capitulated to DOJ's "max-black" requirement to maximize majority-Black districts at the expense of all non-racial redistricting criteria. 515 U.S. at 907. Similarly, in *Clark v. Putnam County*, the county's §5 submission reported that "black voting strength in Putnam County has been maximized" by including "every contiguous census block which would have the effect of increasing the black percentage

50

in the two majority black voting districts." 293 F.3d 1261, 1267 & n.17, 1275 (11th Cir. 2002). The county explained in its correspondence that it had "*requested*" that two districts have BVAPs "as high as possible." *Id.* at 1268.

Compare *Cooper*, *Miller*, and *Clark* to here, where Plaintiffs have no such "direct admission of intent" in the county's anodyne §5 correspondence. *See, e.g., Chen v. City of Houston*, 206 F.3d 502, 518-19 (5th Cir. 2000) (discussing city's objective to create minority-majority districts and still finding it insufficient to support a gerrymandering claim). The county simply reported the *resulting* racial demographics of redrawn districts so that DOJ could determine the extent of the changes and whether they would have the effect of denying or abridging voting rights. That "raw history" of compliance, "which contains no brazen admission that race predominated," *id.* at 519, falls far short of proving that race was the criterion that could not be compromised in past decades, let alone in 2021.

## B. Past redistricting efforts cannot be imputed to the present-day Commission.

Even assuming race somehow predominated in past plans, only the 2021 Enacted Plan was before the district court. This Court has "rejected the argument that 'a racist past is evidence of current intent.'" *LWV of Fla. v. Fla. Sec'y of State*, 66 F.4th 905, 923 (11th Cir. 2023); *see also Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1325 (11th Cir. 2021) (*GBM*) (noting the "danger" of relying on "the old, outdated intentions of previous generations"). There is no basis for carrying forward the intent

of past officials to "condemn governmental action" today "that is not itself unlawful." *Abbott*, 585 U.S. at 603 (quotation marks omitted).[20] Yet the district court said "prior line-drawing sheds light on the Commission's predominant purpose in 2021." Op.97. Without any evidence that the 2021 Commission knew of, let alone shared, a past official's discriminatory intent, the court determined that some alleged decades-old intent tainted the 2021 process. *Contra GBM*, 992 F.3d at 1325. This "fundamentally flawed" approach, *Abbott*, 585 U.S. at 607, disregards the presumption of legislative good faith and "plunge[s] … into far-reaching expeditions regarding the sins of the past in order to question the laws of today," *Johnson v. Governor of Fla.*, 405 F.3d 1214, 1225 n.21 (11th Cir. 2005) (en banc).

A foray into history to discern present-day intent must be limited to the "precise circumstances surrounding the passing of the … law." *GBM*, 992 F.3d at 1325. Here, the district court engaged in the prohibited "unlimited look-back." *Id.* Past officials' redistricting correspondence provides no more evidence of the 2021 Commission's intent than past officials' correspondence on any other issue. Even where a later legislature reenacts the exact same law, a past legislator's comments about that law do not "reverse the presumption" that the law is constitutional. *See Johnson*, 405 F.3d at 1225

---

[20] The district court characterized *Abbott* as a "Section 2 VRA case, not a racial gerrymandering case" focused on "discriminatory intent rather than predominant purpose." Op.96 n.34. But *Abbott* had both §2 and gerrymandering claims. *See* 585 U.S. at 598. And the district court offered no basis for limiting *Abbott*'s caution about treating past instances of unlawful racial purpose as "original sin," *id.* at 603, for some claims but not others.

n.21. Without evidence that a later Commission intended to carry forward any discriminatory purpose of an earlier one, the district court's reliance on history is misplaced and "condemn[s]" the current plan "in the manner of original sin." *See Abbott*, 585 U.S. at 603, 608 (explaining that "there is no evidence that the Legislature's aim was to gain acceptance of plans that it knew were unlawful").

In sum, statements of the racial *effects* of past redistricting plans, as part of required §5 correspondence with DOJ, cannot be converted into statements of racial purpose in 2021. The county's past §5 compliance is not evidence of racial predominance in those years, and certainly not for 2021.

## CONCLUSION

This Court should reverse the decision below and vacate the permanent injunction.

Dated: November 10, 2025                    Respectfully submitted,

                                            /s/ *Taylor A.R. Meehan*

Theodore A. Lawson, II                      Taylor A.R. Meehan
JEFFERSON COUNTY ATTORNEY'S OFFICE          Rachael C.T. Wyrick
716 Richard Arrington Jr. Blvd. North       Marie E. Sayer
Room 280                                    Soren Geiger
Birmingham, AL 35203                        CONSOVOY MCCARTHY PLLC
(205) 325-5688                              1600 Wilson Blvd., Suite 700
lawsont@jccal.org                           Arlington, VA 22209
                                            (703) 243-9423
Michael Taunton                             taylor@consovoymccarthy.com
BALCH & BINGHAM LLP                         rachael@consovoymccarthy.com
1901 Sixth Ave. N. Suite 1500               mari@consovoymccarthy.com
Birmingham, AL 35203                        soren@consovoymccarthy.com
(205) 226-3451
mtaunton@balch.com                          Patrick Strawbridge
                                            CONSOVOY MCCARTHY PLLC
November 10, 2025                           Ten Post Office Square
                                            8th Floor South PMB #706
                                            (703) 243-9423
                                            patrick@consovoymccarthy.com

                                            *Counsel for Appellant*

54

**CERTIFICATE OF COMPLIANCE**

This brief complies with Rule 32(a)(7) because it contains 12,848 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it is prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

Dated: November 10, 2025                                   */s/ Taylor A.R. Meehan*

**CERTIFICATE OF SERVICE**

I filed this brief on the Court's electronic filing system, which will email everyone requiring notice.

Dated: November 10, 2025                                   */s/ Taylor A.R. Meehan*